IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ILLINOIS MINE SUBSIDENCE INSURANCE FUND, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 17-cv-3199 |
| UNION PACIFIC RAILROAD COMPANY, | ) ) ) ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

This matter comes before the Court Plaintiff's Motion for Leave to File First Amended Complaint (d/e 16) (Motion). For the reasons set forth below, the Motion is ALLOWED.

## STATEMENT OF FACTS

Plaintiff alleges in the current Complaint that in 2014 and 2015, two homes in Macoupin County, Illinois (Macoupin County), suffered damage from mine subsidence. Country Mutual Insurance Company (Country Mutual) issued homeowner's insurance policies on both homes that included coverage for mine subsidence. Country Mutual had a reinsurance agreement with Plaintiff Illinois Mine Subsidence Insurance Fund (Fund). The Fund paid $163,600 and $71,400, respectively, to indemnify Country Mutual for moneys paid to the homeowners for

the covered losses. The Fund brings this action under its subrogation rights against Defendant Union Pacific Railroad Company (Union Pacific). Notice of Removal (d/e 1), Exhibit A, Complaint of the Illinois Mine Subsidence Insurance Fund (Complaint), ¶¶ 40-50. The Fund alleges that Union Pacific is liable for the losses due to the subsidence because Union Pacific is the successor to the Superior Coal Company (Superior) which had operated the mines that subsided.

The Fund alleges that the Chicago & Northwestern Railway Company (CNW) established Superior in 1903 to operate coal mines. CNW owned 19,995 of the 20,000 outstanding shares of Superior. The five directors of Superior each owned one of the remaining five shares of Superior stock. The directors of Superior were officers or employees of CNW. The directors each owned a share of Superior stock because a director had to be a stockholder. Superior's place of business was located in CNW's general office. Complaint, ¶¶ 4-8, 14-17, 19(a); see Gillespie Community Unit School Dist. No. 7, Macoupin County v. Union Pacific Railroad Co., 2015 IL App (4th) 1408771 ¶¶ 12-66, 43 N.E.3d 1155, 252-60 (Ill. App. 4th Dist. 2015).

In 1954, CNW's Board of Directors adopted a resolution to cease all of Superior's mining operations because of CNW's decreasing demand for coal. CNW Board also instructed Superior to cease mine operations on June 1, 1954 unless a purchaser of Superior's assets had been located. Complaint, ¶ 29-30.

On September 14, 1956, CNW's Board of Directors passed a resolution stating that it was in the best interest of CNW that Superior be dissolved. In October 1956, Superior filed a statement of its intent to dissolve. The statement recited that CNW's Board of Directors had resolved that the proper officers of CNW would arrange for the dissolution of Superior. Complaint, ¶¶ 35-36.

In December 1956, Larry Provo, President of Superior and Vice President of CNW, and E.A. Vik, Secretary of Superior and Secretary of CNW, executed a deed transferring all of Superior's land and mineral rights in Macoupin County to CNW. Superior made the transfer without receiving any consideration. Complaint, ¶ 37.

In 1957, Superior was dissolved. Superior's assets, together with those liabilities which could not be fully liquidated prior to dissolution, were transferred to and assumed by CNW. The Fund alleges that Superior's liability for mine subsidence damage was not and could not be fully liquidated prior to Superior's dissolution. Complaint, ¶¶ 9.

In 1970, CNW sold all of its assets and liabilities to North Western Employees Transportation Corporation. In 1972, North Western Employees Transportation Corporation changed its name to Chicago and North Western Transportation Company. In 1994, Chicago and North Western Transportation Company changed its name to Chicago and North Western Railway Company

(New CNW). In October 1995, New CNW merged with Defendant Union Pacific. Union Pacific became the successor corporation after the merger. Complaint, ¶¶ 10-13.

From 1996 to 2008, Union Pacific paid the Fund more than $900,000.00 to reimburse the Fund for losses to at least 20 insured structures due to subsidence in properties over mines operated by Superior. The releases signed by Union Pacific stated that Union Pacific was "the successor in interest" to CNW and Superior. The releases released Union Pacific, CNW, and Superior. The releases were contractual releases and not merely recitals. Complaint, ¶ 39.

Based on these and additional allegations not pertinent here, the Complaint asserts a claim that Union Pacific's predecessor CNW was the alter ego of Superior, and so, was liable for damages caused by the subsidence of Superior's Macoupin County mines. Complaint, ¶¶ 14-39, 51-59.

The Fund now moves to amend the Complaint to assert a claim that the transfer of Superior's assets to CNW and the dissolution of Superior was a de facto merger through which CNW assumed all of the liabilities of Superior.

The proposed Amended Complaint alleges the following. On September 14, 1956, CNW's Board of Directors passed a resolution to dissolve Superior. On October 12, 1956, the shareholders of Superior executed a statement of intent to dissolve, and that in December 1956, Provo, President of Superior and

Vice President of CNW, and Vik, Secretary of Superior and Secretary of CNW, executed a deed transferring all of Superior's land and mineral rights in Macoupin County to CNW. Superior made the transfer without receiving any consideration. Motion, Exhibit A, First Amended Complaint of the Illinois Mine Subsidence Insurance Fund (Amended Complaint), ¶¶ 41-43.

The proposed Amended Complaint alleges that in February 1957, Superior was dissolved. After the December 1956 transfer and February 1957 dissolution of Superior, CNW became the owner of all of Superior's land and mineral rights in Macoupin County. After the transactions, Provo and Vik continued on as officers of CNW. In 1958, Vik was CNW's secretary and Provo was acting as CNW's president. Amended Complaint, ¶¶ 45-48.

ANALYSIS

The Fund has filed this timely Motion to amend its pleadings. Motions to amend should be freely granted when justice so requires. Fed. R. Civ. P. 15(a)(2). Union Pacific objects, asserting that the proposed amendment is futile. The Court may deny requests to amend pleadings for several reasons, including a proposed amendment that is futile. See Mulvania v. Sheriff of Rock Island County, 850 F.3d 849, 854 (7th Cir. 2017). The Court evaluates the futility of a proposed amendment under the standard for motions to dismiss for failure to

state a claim. Runnion ex rel. v. Girl Scouts of Greater Chicago and Northwest Indiana, 786 F.3d 510, 526 (7th Cir. 2015); Fed. R. Civ. P. 12(b)(6).

The Federal Rules require only "a short and plain statement of the claim showing that the pleader is entitled to relief," and allegations must be "simple, concise, and direct." Fed. R. Civ. P. 8(a)(2) & (d)(1). While a complaint need not contain detailed, specific factual allegations, it must contain sufficient facts to "state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible if the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A claim is plausible on its face if it provides the defendant fair notice of what the claim is and the grounds upon which it rests. George v. Smith, 507 F.3d 605, 608 (7th Cir. 2007). Dismissal under Rule 12(b)(6) is appropriate when "the factual detail in a complaint [is] so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." Airborne Beepers & Video, Inc. v. AT & T Mobility, LLC, 499 F.3d 663, 667 (7th Cir. 2007).

To assert successor liability due to a de facto merger, the Fund must allege:

(1) The seller's enterprise continues after the transaction, including a continuation of management, personnel, physical location, assets and general business operations.

(2) The seller's shareholders become shareholders of the purchaser so that they become a constituent part of the purchaser.

(3) The seller corporation ceases its ordinary business operations, liquidates and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

See Myers v. Putzmeiter, Inc., 596 N.E.2d 754, 756 (Ill. App. 1992).

When read favorably to the Fund, the proposed Amended Complaint states a claim for liability under a de facto merger theory. The allegations show a continuation of Superior's enterprise. Superior deeded the Macoupin County land and mineral rights to CNW, and CNW took over Superior's other assets. Superior's President and Secretary Provo and Vik continued as officers of the buyer CNW after the transaction. Provo became President of CNW in 1958.

The allegations also showed a continuity of ownership. Before the transaction, CNW shareholders owned Superior's enterprise indirectly because

CNW owned the vast majority of Superior's shares. After the transaction, the CNW shareholders owned Superior's enterprise directly.

Finally, the allegations show that Superior dissolved shortly after the transaction and CNW took on the liabilities necessary for the continuation of Superior's enterprise. The proposed Amended Complaint is not futile.

Union Pacific argues that the Fund failed to allege a continuation of Superior's enterprise because Superior ceased mine operations in 1954. CNW argues that because there was no enterprise, there was no continuation of any enterprise. Union Pacific cites Gray v. Mundelein College, 296 Ill.App.3d 795, 695 N.E.2d 1379 (Ill. App. 1st Dist. 1998), to support its position. In Gray the selling entity both continued to exist and underwent significant changes in management, employees, and business operations after the transaction. 695 N.E.2d at 1389. In this case, Superior was an active corporation with assets at the time of the transaction. Superior had to maintain those assets. CNW acquired those assets, and so, acquired the obligation to maintain those assets. Further Superior's offices already were located in CNW's general offices at the time of the transaction. Provo and Vik also continued as officers of CNW after the transaction. Finally, Superior dissolved after the transaction. The Gray case, therefore, simply does not apply. When read favorably, the Fund has alleged

some ongoing activity that continued after the transaction. The allegations are not futile.

Union Pacific also argues that the Fund fails to allege a continuity of shareholders. Union Pacific cites cases that state that the purchasing corporation must buy the selling corporation's assets with shares of stock so that the seller becomes a constituent part of the purchasing corporation. E.g., Myers, 596 N.E.2d at 756; Kaleta v. Whittaker Corp., 583 N.E.2d 567, 570-71(Ill. App. 1st Dist. 1991).

Other cases, however, focus on the factual continuity of ownership after the transaction rather than requiring a formal payment of stock for assets. In Fenderson v. Athey Products Corp. Kohlman Div., 220 Ill.App.3d 832, 836, 581 N.E.2d 288, 291 (Ill. App. 1st Dist. 1991), the Court found a continuity of ownership when the purchaser paid the seller $444,000 in cash, executed a promissory note for $850,000, and paid stock worth $420,000 to $500,000. In Steel Co. v. Morgan Marshall Industries, Inc., 278 Ill.App.3d 241, 248-50, 662 N.E.2d 595, 600 (Ill.App. 1st Dist. 1996), the Court found a that an issue of fact existed regarding the continuity of ownership when the purchasing corporation bought the seller's assets from seller's chief secured creditor. The secured creditor had previously foreclosed on the assets and purchased the assets at a private sale under the UCC. The Court found continuity of ownership could exist

because the business continued operating at the same location, the chief executive and owner of the seller became chief executive of the purchaser, and the chief executive's wife owned 80 percent of purchaser's stock. The chief executive's continued control and his wife's ownership of the stock could establish a continuity of ownership. Id.

The <u>Fenderson</u> and <u>Steel Co.</u> cases hold that the realities of the transaction may demonstrate a continuity of ownership even if the parties did not engage in a formal payment of stock for assets. See <u>Fenderson</u>, 581 N.E.2d at 291-92 (rejecting the proposition that purchasing corporation's stock must be the primary consideration paid when the realities of the transaction shows that there was a continuity of ownership); <u>Steel Co.</u>, 662 N.E.2d at 600.

The Fund's proposed allegations, when read favorably to the Fund, show a continuity of ownership. The stockholders of CNW owned all the assets before the transaction through CNW's ownership of Superior, and the stockholders of CNW owned all the assets after the transaction directly as the owners of CNW. Moreover, Superior's President Provo continued as an officer and director of CNW after the transaction and became its president in 1958. When read favorably to the Fund, these allegations are not futile.

THEREFORE, IT IS ORDERED that Plaintiff's Motion for Leave to File First Amended Complaint (d/e 16), is ALLOWED. The Clerk is directed to docket the

proposed First Amended Complaint attached to the Motion.  Defendant Union Pacific is directed to respond to the First Amended Complaint by April 30, 2018.

ENTER: April 11, 2018

                    *s/ Tom Schanzle-Haskins*
                    TOM SCHANZLE-HASKINS
                    UNITED STATES MAGISTRATE JUDGE