**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| ILLINOIS MINE SUBSIDENCE INSURANCE FUND, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | No. 17-cv-3199 |
| UNION PACIFIC RAILROAD COMPANY, | ) ) ) ) | |
| Defendant. | ) | |

## <u>OPINION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

This matter comes before the Court on Plaintiff's <u>Daubert</u> Motion to Exclude the Disclosures and Testimony of Thomas Hilton and Stephen Presser (d/e 36) (Motion 36);  Union Pacific's Motion in Limine to Exclude Testimony of Patrick Akers (d/e 39) (Motion 39); and Union Pacific's Motion in Limine to Exclude Testimony of Mark Hosfield (d/e 40) (Motion 40) (collectively, Motions).  The parties consented to proceed before this Court. <u>Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered August 22, 2018 (d/e 31)</u>.  For the reasons set forth below, the Motions are ALLOWED in part.

## BACKGROUND

Plaintiff Illinois Mine Subsidence Insurance Fund (Fund) is an agency created by Illinois law to provide reinsurance to insurers that provide mine subsidence insurance to landowners in Illinois. In 2016, the Fund paid two claims of $163,600.00 and $71,400.00, respectively, for reinsurance coverage for mine subsidence damage on two residences in Macoupin County, Illinois (the Subsidence Claim). First Amended Complaint of the Illinois Mine Subsidence Insurance Fund (d/e 21) (Amended Complaint) ¶¶ 55-59.

Superior Coal Company (Superior) dug the mines which caused the subsidence damage to the residences. Superior was owned by Chicago and North Western Railway Company (CNW). CNW established Superior in 1903 to provide coal for its locomotives. Superior issued 20,000 shares of stock. CNW owned 19,995 shares of the stock and the five Directors of Superior each owned one of the other five shares. Illinois law at the time required corporate directors to be shareholders. Superior's bylaws followed the then current law and required directors to be shareholders. The Superior Directors were also officers or employees of CNW.

From 1903 to 1947, Superior sold virtually all of its coal to CNW for use in CNW's locomotives. After World War II, CNW converted to diesel

locomotives and no longer needed the coal from Superior. Superior sold some coal commercially beginning in 1947. CNW unsuccessfully attempted to find a buyer for Superior. Ultimately, Superior closed its mines and sold off its equipment in the mid-1950s. In September 1956, CNW's Board of Directors approved a resolution to dissolve Superior, acquired its remaining assets, and assumed some of its liabilities. In December 1956, Superior transferred to CNW its remaining assets, including its mineral rights in Macoupin County, Illinois, and CNW transferred certain of Superior's liabilities onto its books. Superior dissolved and ceased to exist in February 1957. The Court hereinafter refers to this transfer process from September 1956 to February 1957 as the Superior Dissolution. See Gillespie Community Unit School District No. 7 v. Union Pacific Railroad Company, 2015 IL App (4th) 140877, at ¶¶ 1-49, 43 N.E.3d 1155, 1162-64 (Ill. App. 4th Dist. 2015), for a detailed account of the corporate history of Superior and its relationship with CNW, including the Superior Dissolution.

Defendant Union Pacific Railroad Company (Union Pacific) is a successor in interest to CNW and agrees that it is liable for all liabilities of CNW. The Fund claims that Superior and CNW were alter egos of each other at the time Superior existed. The Fund alleges that the Court should

pierce the corporate veil and find that CNW and Superior were one entity, and CNW was responsible for all liabilities of Superior, including the Fund's Subsidence Claim (Alter Ego Claim). The Fund claims, in the alternative, that the Superior Dissolution was a de facto merger between Superior and CNW, and CNW thereby became liable for all of Superior's liabilities, including the Subsidence Claim (De Facto Merger Claim). Union Pacific disputes the Fund's claims. See generally Amended Complaint; Defendant Union Pacific Railroad Company's Answer and Affirmative Defenses to the First Amended Complaint of the Illinois Mine Subsidence Insurance Fund (d/e 22) (Answer).

The state of Illinois and Superior previously litigated whether to pierce the corporate veil between Superior and CNW. The case went to the Illinois Supreme Court. Superior Coal Co. v. Department of Finance, 377 Ill. 282, 36 N.E.2d 354 (Ill. 1941) (Superior I). The Illinois Department of Finance wanted sales tax paid on sales of coal from Superior to CNW. Superior argued that it was a department of CNW and not really a separate corporation so the "sales" of coal were really intradepartmental transfers not subject to sales tax, while the Illinois Department of Finance argued that Superior and CNW were separate corporations and the transfers were

sales subject to tax.[1]  The Illinois Supreme Court found, for purposes of the

Illinois sales tax law, that piercing the corporate veil was not appropriate,

Superior and CNW were separate corporations, and Superior had to pay

the sales tax.  36 N.E.2d at 358-60; see also Superior Coal Co. v.

Department of Revenue, 4 Ill.2d 459, 123 N.E.2d 713 (Ill. 1954) (Superior

II) (acknowledging the holding in Superior I not to pierce the corporate veil).

CNW alleges that decisions by the Illinois Supreme Court in Superior I and

Superior II are controlling in this case.  Answer, at 24-25.  The parties have

not briefed the issue and the Court makes no further comment on this

issue.

In addition, the parties previously litigated Union Pacific's liability for

subsidence damage caused by mines dug by Superior.  The Illinois Fourth

District Appellate Court issued a published opinion in that litigation in 2015,

Gillespie, 43 N.E.3d 1155.  The Appellate Court found that CNW did not

expressly or impliedly agree to assume Superior's contingent liabilities for

possible future mine subsidence when it acquired certain of Superior's

liabilities in the Superior Dissolution.  Gillespie, 433 N.E.3d at 1171-78.

The Appellate Court remanded the Fund's Alter Ego Claim to the state trial

---

[1] Ironically, CNW's successor Union Pacific now takes a position contrary to the position Superior took in Superior I, and the Fund, an agency created by Illinois statute, takes a position contrary to the position the Illinois Department of Finance took in Superior I.

court for further proceedings.  Gillespie, 433 N.E.3d at 1180-89.  The Fund did not raise a De Facto Merger Claim in this prior state litigation.

The parties assume that the Gillespie decision has preclusive effect in this case under the principle of collateral estoppel, also known as issue preclusion.  The parties, however, have not briefed this issue and this Court does not decide the issue.  The Court only notes that generally a decision has preclusive effect on a particular issue in a subsequent case if the issue is the same, the parties are the same, and the issue was fully litigated to judgment in the first case.  See e.g., Wolverine Mut. Ins. v. Vance ex rel. Tinsley, 325 F.3d. 939, 943 (7th Cir. 2003).  This case and the Gillespie case have the same parties and the Fund presented the same Alter Ego Claim in each.  The Appellate Court in Gillespie, however, did not decide the Alter Ego Claim but remanded it for further proceedings.  The parties agree that the Alter Ego claim was not decided in the Gillespie case.  That is why the Fund brings the claim again.

Because the Gillespie decision did not finally resolve the Alter Ego Claim, this Court questions whether the Appellate Court's statement of the law governing the Alter Ego Claim is controlling in this case.  Generally, in diversity cases, this Court will "apply the law of the state as we believe the highest court of the state would apply it."  Wolverine Mut. Ins. v. Vance ex

rel. Tinsley, 325 F3d 939, 942 (7th Cir. 2003); see Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). This Court would need to determine whether the Appellate Court in Gillespie accurately applied the law as the Illinois Supreme Court would have applied it. The Gillespie decision would not be automatically controlling unless the decision had preclusive effect on the Alter Ego Claim. The parties have not briefed the preclusive effect of the Gillespie decision or whether the Gillespie decision accurately applied the Alter Ego law as the Illinois Supreme Court would have applied it. The Court does not decide these issues at this time.

The matter is set for bench trial on February 19, 2019 before this Court. The final pretrial conference is set for February 14, 2019. Text Order entered September 17, 2018. Both parties disclosed expert witnesses. The parties filed the Motions to exclude the testimonies of certain experts. The Fund moves to exclude certain opinions of Union Pacific's expert Thomas Hilton, and all of the opinions of Union Pacific's expert Stephen Presser. Union Pacific moved to exclude the opinions of the Fund's experts Patrick Akers and Mark Hosfield.

<u>ANALYSIS</u>

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  This Court must perform a gatekeeping function to ensure that expert testimony is reliable and relevant under the principles codified in Rule 702.  <u>See</u> <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 597 (1993).  In performing this function, the Court must determine the reliability and the relevance of the expert opinions.  <u>Ammons v. Aramark Uniform Services, Inc.</u>, 368 F.3d 809, 816 (7th Cir. 2004).  The Court must evaluate the qualifications of the expert.  The Court must determine that the expert's opinions are based on sufficient facts and data. The Court then must determine whether the expert testimony is reliable and relevant and whether his opinions will assist the trier of fact in determining

a fact in issue.  See Ammons, 368 F.3d at 816; Manpower, Inc. v. Insurance Co. of Pennsylvania, 732 F.3d 796, 806 (7th Cir. 2013); Wasson v. Peabody Coal Co., 542 F.3d 1172, 1176 (7th Cir. 2008).

The Court, however, does not evaluate the quality of the underlying data or the quality of the expert's conclusions.  "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment."  Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000).

This Court addresses in this Opinion only the Court's gatekeeping function under Rule 702.  The Court does not decide the weight to be given to any of these opinions at the bench trial or the merits of any position of any party on any issues to which the opinions may relate.  The Court only decides whether the opinions meet the standard for admissibility as expert opinion evidence.

During the bench trial in this matter, the Court will continue to perform its gatekeeping function as well as function as the finder of fact.  The Court may decide not to bar an expert's testimony in limine, but later determine after hearing the expert's testimony and the other evidence at trial, that the expert's opinions should be excluded.  See Metavante Corp. v. Emigrant

Sav. Bank, 619 F.3d 748, 760 (7th Cir. 2010).  Because the Court can
reevaluate the expert testimony at trial, the Court is less willing to bar
expert testimony in limine pretrial.  See In re Salem, 465 F.3d 767, 777 (7th
Cir. 2006).

The Court now addresses each expert's opinions separately.

Motion 36

Expert opinions of Thomas Hilton

The Fund seeks to exclude Thomas Hilton's opinions set forth in the
Supplemental Expert Report of Thomas E. Hilton dated August 3, 2018
(Hilton Supplemental Report).  Plaintiff's Memorandum in Support of its
Daubert Motion to Exclude the Disclosures and Testimony of Thomas
Hilton and Stephen Presser (d/e 37) (Fund Memorandum), Exhibit A, Hilton
Supplemental Report).  Hilton issued other reports and expressed other
opinions in the Gillespie case.  See Hilton Supplemental Report, § 1.C. and
Exhibits 4 and 5.  The Fund does not seek to bar any of those opinions in
limine in Motion 36.

The Hilton Supplemental Report concerns the fact that during the
entire existence of Superior from 1903 to 1957, CNW owned 19,995 of the
20,000 outstanding shares of Superior, and the five Directors of Superior
(Superior Directors) each owned one of the remaining five shares in his or

her own name.  Hilton opined that CNW was in fact the beneficial owner of all 20,000 shares and each director had bare legal title to the share he or she owned.  In reaching these conclusions, Hilton identified various pieces of historical evidence of the operation of Superior and transactions involving Superior from business records and from records of the prior court proceedings discussed above (collectively Historical Record) which he believed tended to indicate whether CNW was the beneficial owner of all the shares.

The Court must first determine whether Hilton is competent to state these opinions.  Hilton is an accountant and a CPA with extensive experience in corporate accounting.  As such, he is competent to analyze historical corporate records and related materials and opine on the economic benefits that CNW and the Superior Directors received from ownership of Superior stock.  Hilton is also competent to opine on how decisions of the Superior Directors economically benefited CNW and the Superior Directors directly as shareholders.

Hilton is not competent to opine that CNW was the "beneficial owner" of the five shares titled in the Directors, or that the Directors held "bare legal title" to the remaining shares.  The terms "beneficial owner" and "bare legal title" are legal concepts of ownership used in various areas of the law,

including the law of trusts and equity. Hilton admitted in his deposition that "beneficial owner" and "bare legal title" were not accounting concepts. Plaintiff's Memorandum in Support of its Daubert Motion to Exclude the Disclosures and Testimony of Thomas Hilton and Stephen Presser (d/e 37), Exhibit C, Excerpts of Deposition of Thomas Hilton, at 40, 47, 74. He is not competent to render these opinions.

With respect to the opinions that Hilton is competent to give, he used his experience and knowledge of accounting and business practices to examine the Historical Record to opine on which stockholders directly benefited economically from the ownership of the stock and from the decisions of the Superior Directors. Hilton's methodology, therefore, was valid with respect to the opinions that were within his competence.

Hilton's competent opinions may be relevant to the issues in the Alter Ego Claim. Regardless of whether the Gillespie opinion is controlling under collateral estoppel or accurately states the Illinois Supreme Court's view of the applicable law, the nature of the relationship between Superior and CNW is relevant to whether the Court should pierce the corporate veil under the alter ego theory. See e.g., Main Bank of Chicago v. Baker, 86 Ill.2d 188, 427 N.E.2d 94, 101 (Ill. 1981). Therefore, Hilton's permissible opinions about whether CNW received all the economic benefit and

whether the decisions of the Superior Directors benefited CNW or the Directors could be relevant.

Hilton's permissible opinions may not significantly assist the Court as the trier of fact in this bench trial in determining a fact in issue. The Court can review admissible Historical Record and determine how Superior was operated. Hilton, however, may have some insight that could assist the Court. The testimony, therefore, may provide at least some assistance to the Court. The Court bars Hilton from opining that CNW was the beneficial owner and the Superior Directors owned bare legal title of five shares of Superior stock. Hilton, may however, testify to his other opinions in the Hilton Supplemental Report.

<u>Expert Opinions of Stephen B. Presser</u>

Presser is a law professor and an expert in corporate law. He opined that CNW and Superior engaged in standard business practices of a corporate parent (CNW) and a subsidiary corporation (Superior). Presser is competent to render these opinions. He is an expert in corporate law and has extensive experience studying the practices of corporations. Presser also opined on the policies of the law relevant to the Alter Ego Claim. Presser is competent to render these opinions. He is a scholar of corporate law and so is well aware of the policies behind corporate law.

Presser also opined on the ultimate question of whether the facts establish the Fund's Alter Ego Claim (Alter Ego Opinions).  The Alter Ego Opinions are set forth in paragraphs 48-58 of his report.  <u>Plaintiff's Memorandum in Support of its Daubert Motion</u> (d/e 37), Exhibit B, <u>Expert Report of Stephen J. Presser dated August 3, 2018</u>,  p. 11-14. These paragraphs contain essentially legal argument and legal conclusions on each element of the Alter Ego Claim as framed by Presser.  Presser is not competent to render these opinions.  The ultimate issues are reserved for the Court as the finder of fact.  See <u>e.g.</u>, <u>Good Shepherd Manor Foundation, Inc. v. City of Momence</u>, 323 F.3d 557, 564 (7th Cir. 2003).  He may not testify to these opinions at trial.

Presser used an appropriate methodology to opine on whether CNW and Superior engaged in standard practices of a parent and subsidiary corporation.  He examined the Historical Record in light of his experience and understanding corporate practices.  He is competent to render these opinions.  Presser also used an appropriate methodology in opining on the policies underlying the corporation law in the United States.  He is a recognized expert in corporation law and relied on that expertise to set forth his opinions on the policies underlying those principles.

Presser's opinions on whether CNW and Superior engaged in standard practices of a parent and subsidiary corporation are relevant to this case. The Fund must show that failing to pierce the corporate veil "would, under the circumstances, sanction a fraud or promote injustice." See Main Bank of Chicago, 427 N.E.2d at 101 (quoted by Gillespie, 43 N.E.3d at 1180); see also Superior I, 36 N.E.2d at 360. Presser's opinions of whether CNW and Superior engaged in standard practices may be relevant to this issue.

Presser's opinions on the policies underlying general corporate law, however, are not relevant. Illinois law controls here. The Illinois statutes and court decisions set forth the policies underlying that law. The policies of general corporate law throughout the United States may be relevant on open questions in Illinois, but otherwise are largely irrelevant to this case.[2]

Presser's opinions on standard industry practices may be of some limited value to the Court. He is an expert on corporate practices and so can evaluate the practices of Superior and CNW. Presser's statements of the policies underlying corporate law generally will not assist the Court as

---

[2] The Plaintiff Fund argues that Presser's formulation of the law governing its Alter Ego Claim conflicts with controlling law in this case. The Fund asserts that the Gillespie decision's formulation of the law controls here. As explained above, the parties have not briefed this issue and the Court does not at this time decide whether the Gillespie decision's discussion of the law governing the Alter Ego Claim is controlling here.

the trier of fact. Illinois law controls, not general corporate law principles. The Court can also resolve any possible open questions of law in Illinois without the benefit of expert opinions. Presser may not opine on the general policies underlying corporate law as set forth in ¶¶ 16-22 of his report.

The Court, therefore, bars Presser from testifying at trial to his opinions set forth in paragraphs 16-22 and 48-58 of his report, but the Court will not bar his opinions regarding whether CNW and Superior engaged in standard business practices of a parent and subsidiary corporate relationship.

### Motion 39  Expert Opinions of Patrick Akers

Akers has experience in the coal industry at various positions. He was the General Manager of Bridger Coal Company (Bridger), a coal mine company that he described as a captive mine company. Akers said that Bridger was a captive mine company because it was owned by a utility company and produced coal only for the utility, much the way Superior supplied coal for CNW. Akers opined that Superior was a captive mine company and that Superior operated as a department of CNW rather than as a separate business. Akers analyzed the Historical Record and

identified various evidence that indicated that CNW operated Superior for the benefit of CNW.

Akers is qualified to render opinions on coal companies owned and operated by a coal consumer. He was a senior executive of such a coal company. Akers also has extensive experience in other aspects of coal mining. Akers has specialized knowledge that qualifies him to opine on the nature of the relationship between a coal company owned and operated to supply coal to its owner.

Akers is not qualified to opine that Superior operated as a department of CNW rather than a subsidiary corporation. Akers is an expert in mining companies, not corporations generally. Furthermore, this opinion crosses the line into opining on an impermissible legal relationship rather than describing the factual relationship between the parties. See Good Shepherd Manor Foundation, Inc., 323 F.3d at 564. Akers may not opine on whether Superior operated as a department of CNW rather than as a separate subsidiary corporation.

Akers used a reliable methodology to render his permissible opinions. Like Hilton and Presser, Akers reviewed the Historical Record and applied his experience and expertise to interpret that record. He used a reliable method.

Akers' permitted opinions are relevant to the Alter Ego Claim. As with Hilton and Presser's opinions, the method by which CNW operated Superior is relevant to determining elements of the Alter Ego Claim. Akers' opinions on the factual nature of that relationship is therefore relevant to this claim.

Like the opinions of Hilton and Presser, Akers' opinions may not offer a great deal of assistance to the Court as the trier of fact. The Court, again, can review the Historical Record admitted into evidence and assess the relationship between CNW and Superior. Akers may still provide some insight to the Court. His opinions, like Hilton's, may provide some assistance to the Court as the trier of fact. The Court will not exclude them on these grounds.

Akers, therefore, may opine as to the manner in which CNW related to Superior, but may not opine on whether Superior operated as a department of CNW rather than as a subsidiary corporation. Union Pacific's arguments to the contrary are not persuasive.

<u>Motion 40  Expert Opinions of Mark Hosfield</u>

Mark Hosfield is an accountant and business consultant. He has experience in analyzing business transactions. He has testified extensively as an expert in various business disputes. He opined that

1. The records of CNW and Superior establish that Superior was operated purely to serve the interests and needs of CNW and that Superior was dominated in the interest of CNW rather than in the interest of Superior or its minority shareholders.

2. From a business and accounting perspective, the merger and dissolution of Superior into CNW meets the criteria for de facto merger.

Motion 40, Exhibit A1, Expert Report and Disclosure of Mark J. Hosfield, at 6. As with Hilton, Presser, and Akers, Hosfield based his opinion on his review of the Historical Record and his expertise in business relations and business transactions.

Hosfield is competent to opine whether Superior operated to serve the interests and needs of CNW and whether Superior provided any direct benefits to the Superior Directors as shareholders of Superior. He is an experienced accountant and business consultant. He can see from the records how CNW and Superior related to each other and whether CNW operated Superior for its own benefit.

Hosfield is not competent to opine that the Superior Dissolution met the criteria for a de facto merger. A de facto merger is an exception to the general rule of law of corporate limited liability under which an existing corporation may be held liable for the actions of a business entity that no longer exists. See Steel Co. v. Morgan Marshall Industries, Inc., 278

Ill.App.3d 241, 248, 662 N.E.2d 595, 599-600 (Ill. App. 1st Dist. 1996); see also Vernon v. Schuster, 179 Ill.2d 338, 346, 688 N.E.2d 1172, 1177 (Ill. 1997); Eriem Surgical, Inc. v. United States, 843 F.3d 1160, 1161-62 (7th Cir. 2016).  Opining that a transaction meets the criteria for a de facto merger is opining a legal conclusion on the ultimate issue of the De Facto Merger claim.  Hosfield dresses the opinion up by stating that he is making the opinion "from a business and accounting perspective;" the opinion, however, is still an inadmissible legal conclusion.  Hosfield is not competent to opine on this legal conclusion and such an opinion is not admissible. See Good Shepherd Manor Foundation, Inc., 323 F.3d at 564.

That being said, Hosfield is competent to opine about the Superior Dissolution.  He may opine that after the Superior Dissolution:  (1) CNW continued the business of Superior;  (2) CNW continued the management of Superior; (3) Superior's shareholders were shareholders of CNW; (4) Superior ceased operations; and (5) CNW assumed the liabilities of Superior necessary to continue Superior's operations (collectively the Dissolution Transaction Opinions).  Hosfield included the Dissolution Transaction Opinions in his report.  He is competent to review the Historical Record and form these opinions.

Hosfield's methodology is reliable to determine whether Superior was operated to serve the economic needs and interests of CNW. Hosfield analyzed the Historical Record using his expertise. The Historical Record can show whether Superior served the needs and interests of CNW. Hosfield can also opine on whether Superior was operated to provide a direct economic benefit to the five minority shareholders who were also Superior Directors (Shareholder/Directors). The Historical Record, however, does not contain sufficient information regarding the interests of the Shareholder/Directors to opine that Superior did not operate in their interests. The individuals were Directors of Superior, but also were officers or employees of CNW. The Shareholder/Directors may have furthered their own interests by directing Superior to serve the needs and interests of CNW. Hosfield does not cite evidence in the Historical Record to support his opinions that Superior was not operated in their interests. Hosfield's methodology of reviewing the Historical Record, therefore, allows him to opine on whether Superior was operated to serve the interests and needs of CNW rather than providing a direct economic benefit to the Shareholder/Directors as shareholders of Superior, but his methodology does not allow him to opine on whether Superior was operated to further the overall interests of the Shareholder/Directors.

Hosfield's methodology to form the Dissolution Transaction Opinions is reliable. The Historical Record provides meaningful information to form these opinions. Hosfield cites facts in the Historical Record and relies on his expertise to formulate his opinions. The methodology is valid.

Hosfield's opinion that Superior was operated to serve the interests and needs of CNW rather than a direct economic benefit to the Shareholder/Directors as shareholders of Superior is relevant to this case. As discussed above, the relationship between the two entities is relevant to the Alter Ego Claim. Hosfield's Dissolution Transaction Opinions may be relevant to the De Facto Merger Claim. See Steel Co. v. Morgan Marshall Industries, Inc., 278 Ill.App.3d 241, 248.[3] The opinions go to the factual issues underlying the question of whether a business transaction will be subject to the de facto merger exception to corporate limited liability.

Like the other experts discussed above, Hosfield's opinions may not provide much assistance to the Court in determining a fact at issue. The Court can review the admissible Historical Record and resolve the factual issues. Like the other experts, Hosfield may provide some insight to the Court, so his opinions might provide some assistance. Hosfield may not

---

[3] The Court has not found an Illinois Supreme Court decision directly addressing the elements necessary to find that a transaction was a de facto merger. The Court cites the Steel Co. case only to show relevance of the opinions. The Court is not deciding at this time whether the Illinois Supreme Court would apply the law relevant to de facto mergers in the same manner as the Appellate Court did in Steel Co. Id.

opine on whether Superior was operated to further the personal interests of the Shareholder/Directors, and he may not opine that the Superior Dissolution met the criteria of a de facto merger. He may render the other opinions discussed in this Opinion from his report.

The Court, again, is only performing the gatekeeping function under Daubert and Federal Rule of Evidence 702 at this stage in the case. The Court is not deciding the weight that the Court will give any of these opinions at the bench trial. The Court may also reconsider whether a particular opinion is admissible after hearing the testimony at the bench trial. Metavante Corp., 619 F.3d at 760.

THEREFORE, IT IS ORDERED that Plaintiff's Daubert Motion to Exclude the Disclosures and Testimony of Thomas Hilton and Stephen Presser (d/e 36), Union Pacific's Motion in Limine to Exclude Testimony of Patrick Akers (d/e 39), and Union Pacific's Motion in Limine to Exclude Testimony of Mark Hosfield (d/e 40) are ALLOWED in part as set forth above.

ENTER:   January 16, 2019


        s/ *Tom Schanzle-Haskins*
    _____
        TOM SCHANZLE-HASKINS
    UNITED STATES MAGISTRATE JUDGE