**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| ILLINOIS MINE SUBSIDENCE INSURANCE FUND, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 17-cv-3199 |
| UNION PACIFIC RAILROAD COMPANY, | ) ) ) ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

This matter came before the Court on February 19, 2019, for a bifurcated bench trial. The Plaintiff Illinois Mine Subsidence Fund (Fund) appeared by its attorneys Todd Schenk and Aon Hussain. The President and CEO of the Fund Heidi Weber also appeared at the trial. The Defendant Union Pacific Railroad Company (Union Pacific) appeared by its attorneys Gary Elden and Riley Mendoza. The parties have consented to proceed before this Court. Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered August 22, 2018 (d/e 31). For the reasons set forth and detailed below the Court enters judgment in favor of Defendant Union Pacific and against the

Plaintiff Fund.  The following constitutes the Court's findings of fact and conclusions of law.

In light of the Court's entry of judgment in favor of Union Pacific, the Court denies as moot Union Pacific's Motion at the Close of Plaintiff's Case for Judgment on Partial Findings (d/e 52), Motion at Trial to Strike Akers Opinion Testimony (d/e 53), and Motion at Trial to Strike Hosfield Opinion Testimony (d/e 54).

## BACKGROUND

The State of Illinois created the Fund to provide reinsurance for insurers that provide mine subsidence insurance to property owners in Illinois.  See 215 ILCS 5/803.1.  The statute required insurers to secure subrogation rights from insureds for mine subsidence claims and authorized the Fund to assert such subrogation rights against parties responsible for subsidence damage.  215 ILCS 5/815.1.  In 2014, Harold and Tressa Besserman of Macoupin County, Illinois, allegedly suffered mine subsidence damage to their home, a single-family residence.  In 2015, Ronald and Cindy Bartolino, also of Macoupin County, Illinois, allegedly suffered mine subsidence damage to their home, a single-family residence.  The residences of the Bessermans and the Bartolinos are hereinafter referred to as the Residences.  The Bessermans and the

Bartolinos both purchased homeowners' insurance policies from Country Mutual Insurance Company (Country Mutual). Those policies included mine subsidence coverage. The Bessermans and the Bartolinos filed claims with Country Mutual (collectively the Subsidence Claims). Country Mutual had purchased mine subsidence reinsurance from the Fund. Country Mutual paid the Bessermans $163,600.00 and paid the Bartolinos $71,400.00 on their claim. The Fund reimbursed Country Mutual under the reinsurance policy a total of $235,000.00 ($163,600.00 + $71,400.00).[1] Transcript of Trial Proceedings Volume 1 (d/e 58) (T. 58), at 66-69 (Lovrak); Exhibit 199, Claims Files for Bessermans and Bartolinos, at F0002009 (Country Mutual Check to Bessermans), F0002016 (Fund approval of reimbursement to Country Mutual for payment to Bessermans), and F0002285 (Fund check to Country Mutual for reimbursement of Bartolinos' claim).[2]

---

[1] The Bessermans claimed a loss of $245,000.00, but under the terms of their homeowners' insurance policy, Country Mutual only paid $163,600.00 for the loss because of policy limits on mine subsidence coverage. The Fund paid $163,600.00 in reinsurance and only seeks recovery of the $163,600.00. The Bessermans' claim of an additional $80,000.00 loss is not at issue in this case. T. 58, at 66-68 (Lovrak). When referencing the trial transcript, the Court states the witness' last name after the page number.

[2] The Court cites trial exhibits as "Ex." followed by the exhibit number. The Fund submitted trial exhibits 1-199, and Union Pacific submitted trial exhibits 200-269. The Court generally cites to Bates Stamp page numbers unless the documents, such as expert reports and deposition transcripts, do not have Bates Stamp page numbers. In citations to the trial transcript, the Court includes in parentheses the last name of witness whose testimony is cited.

The Fund brings this action against Union Pacific as subrogee of the Subsidence Claims to recover the $235,000 in reinsurance paid on the Subsidence Claims, plus interest and costs.  First Amended Complaint (d/e 21) (Complaint),  ¶ 59 and Prayer for Relief.

Union Pacific, however, did not own or operate any coal mines. Superior Coal Company (Superior) owned and operated the mines that the Fund alleges caused the subsidence damage to the Residences and gave rise to the Subsidence Claims.  Superior operated four coal mines in Macoupin County from 1904 through 1953.  Superior was dissolved in 1957 (Superior Dissolution).  Stipulation of Undisputed Facts (d/e 34) (Stipulation of Facts), ¶¶ 8, 42.  The Fund alleges that Superior's parent corporation, the Chicago and North Western Railway Company (CNW), was liable for all the acts of Superior.

In 1995, CNW merged into Union Pacific.  Stipulation of Facts, ¶ 45.[3] Union Pacific agrees that, after the merger, it is liable for all liabilities of CNW but denies that CNW was liable for Subsidence Claims or any other claims against Superior that were not known in 1957 when Superior dissolved.  See Defendant Union Pacific Railroad Company's Answer and

---

[3] CNW went through a series of corporate reorganizations from 1957 to 1995.  Union Pacific does not claim that any of these reorganizations affected its assumption of the liabilities of CNW.

Affirmative Defenses to the First Amended Complaint of the Illinois Mine Subsidence Insurance Fund (d/e 22) ¶¶ 14, 65; Stipulation of Facts, ¶ 45.

The Fund and Union Pacific have previously litigated similar subsidence claims.  One such case involved a subsidence at a public school building in the town of Gillespie located in Macoupin County, Illinois. Gillespie Community Unit School Dist. No. 7, Macoupin County v. Union Pacific R. Co., 2015 IL App (4th) 140877, 43 N.E.3d 1155 (Ill. App. 4th Dist. 2015) (Gillespie).  The Fund was a party plaintiff in Gillespie.  Gillespie, 43 N.E.3d at 1161. The Fund claimed in Gillespie that CNW was liable for damages resulting from subsidence of Superior's mines because: (1) CNW agreed to assume all of Superior's liabilities including contingent liabilities for future subsidence claims as part of the Superior Dissolution; (2) CNW was a direct participant in Superior's business operations; or (3) CNW operated CNW and Superior as a single entity so that the two corporations were "alter egos" of each other and, therefore, the Court should "pierce the corporate veil" between Superior and its stockholder CNW, and hold CNW liable for all of Superior's debts. The third claim is referred to as the "alter ego" claim.  Gillespie, 43 N.E.3d at 1172, 1179, 1180.

The Illinois Appellate Court  in Gillespie found that CNW only agreed to assume Superior's liabilities that were known at the time of the Superior

Dissolution in 1957, and CNW did not agree to assume unknown, contingent liabilities such as the Subsidence Claims. <u>Gillespie</u>, 43 N.E.3d at 1176-79.[4] The Illinois Appellate Court further found that CNW was not liable under a theory of direct participation. <u>Gillespie</u>, 43 N.E.3d at 1179-80.

The Illinois Appellate Court in <u>Gillespie</u> remanded the alter ego claim for further proceedings. <u>Gillespie</u>, 43 N.E.3d at 1162. The case was settled on remand. As a result, the alter ego claim was not fully litigated. <u>See</u> <u>Opinion entered January 16, 2019 (d/e 44)</u>, at 5-7.

In this case, the Fund realleges the alter ego claim. The Fund also alleges in the alternative that CNW assumed all of Superior's liabilities because the Superior Dissolution constituted a de facto merger of Superior into CNW. <u>Complaint</u>, ¶¶ 60-78. The Fund did not assert the de facto merger claim in the <u>Gillespie</u> case.

The parties stipulated to a bench trial and to bifurcate the issues of liability and damages for trial. <u>Agreed Stipulation Regarding Litigation (d/e 32)</u>. Pursuant to this stipulation, the Court bifurcated the bench trial. <u>Minute Entry entered September 17, 2018</u>. In this phase of the trial, the

---

[4] The Subsidence Claims accrued when the alleged subsidence damage to the Residences occurred in 2014 and 2015. <u>See</u> <u>Gillespie</u>, 43 N.E.3d at 1169.

Court tried whether CNW was liable for claims against Superior that were not known at the time of the Superior Dissolution, including the Subsidence Claims, under either the Fund's alter ego claim or its alternative de facto merger claim. All other issues were reserved for subsequent proceedings.

The Fund brought this case in 2017. The relevant events occurred between 1902 and 1957. By 2017, the individuals with personal knowledge of the relevant events were all deceased. Both parties rely exclusively on historical documents and data (Historical Record) and the opinions of experts who reviewed the Historical Record. Neither party has challenged the admissibility of the documents and data comprising the Historical Record, but both have challenged the admissibility of some or all of the testimony of the opposing party's experts. The parties also agreed to use discovery produced in other cases between the Fund and Union Pacific, including the Gillespie case.

## FINDINGS OF FACT

### I.  Formation of Superior

In the late 19th century and most of the 20th century, CNW operated railroads in the United States. Prior to 1945, most of CNW's locomotives burned coal. In 1902, CNW acquired mineral rights or fee ownership to a total of 25,000 acres in Macoupin County, Illinois (Coal Lands). Ex. 161,

Superior Coal Company Dissolution Records Compilation (Superior

Dissolution Compilation), at UP-ST176060.   In 1903, CNW incorporated

Superior as an Illinois corporation.  The Superior articles of incorporation

stated the purpose of Superior:

> The object of the corporation shall be to mine and sell coal, and
> for that purpose to acquire, own and lease such lands and to
> acquire and hold such coal rights, and such other real and
> personal estate as may be necessary.

Ex. 1, Superior Coal Company Minute Book Vol. 1 (Superior Minute Book

Vol. 1), at UP-ST175661.

CNW initially contributed $1,500,000.00 to capitalize Superior.  In

April 1904, CNW contributed an additional $500,000.00 in capital to bring

Superior's total capitalization to $2,000,000.00.  As part of the capital

contributions, CNW conveyed the Coal Lands to Superior.  Superior issued

20,000 shares of stock.[5]   All shares were voting.  Stipulation of Facts,  ¶¶

1-4; Ex. 1, Superior Minute Book Vol.1, at UP-ST175676-78.

Of the 20,000 shares, 19,995 were owned by CNW in its own name.

Each of Superior's five Directors was named as the owner of one of the five

---

[5] The Superior Minute Book shows that Superior initially issued 9,000 shares of stock in 1903, and then issued additional shares by April 1904 when its capitalization increased to $2,000,000.  Superior increased its outstanding shares to 17,000 shares by June 1, 1905, and then increased its outstanding shares to 20,000 shares by June 1906.  At all times, CNW held all but five shares in its own name, and each of the five Directors held one of the remaining five shares. Ex.1, Superior Minute Book Vol. 1, at UP-ST175671, UP-ST175676-78; UP-ST175687.

remaining shares (Directors' Shares). Illinois corporation law at the time required directors to be "bona fide shareholders." See Gillespie, 2015 IL App (4th) 140877 ¶ 17; 43 N.E.3d at 1163. The bylaws of Superior tracked the Illinois law and also required the Directors to be "bona fide shareholders." Ex. 1, Superior Minute Book Vol. 1, at UP-ST175666.

CNW paid all of the capital contributions to Superior for all 20,000 shares of stock. Stipulation of Facts ¶ 3. The initial Directors did not pay anything to anyone to purchase the Directors' Shares. The Superior Directors always voted the Directors' Shares in accord with the vote of the 19,995 shares owned in the name of CNW. See e.g., Ex. 1, Superior Minute Book Vol. 1, at UP-ST175687. No documentary evidence exists of any dissenting vote of a Superior Director during Superior's operations. Stipulation of Facts, ¶ 5.

CNW reported to the Interstate Commerce Commission (ICC) that it owned all of the stock in Superior. See e.g., Ex. 4, Annual Report of CNW to the ICC for year ending June 30, 1915, at UP-ST004767; Ex. 5, Annual Report of CNW to the ICC for year ending June 30, 1916, at UP-ST0006255; Ex. 6, Annual Report of CNW to the ICC for year ending December 31, 1916, at UP-ST006396. Superior represented to the Illinois Department of Finance that CNW owned all of its stock and that the "five

director's qualifying shares" were "held for the Railway Company."  Ex. 89, In the Matter of the Sales Taxes of Superior Coal Company (Illinois Department of Finance Case No. 156 August 6, 1935), Trial Exhibit 1, Summary of History of the Superior Coal Company and its Relations with the Chicago and North Western Railway Company (1935 History of Superior Coal and CNW), at SDSJ 161.  The stockholders' consent to dissolve Superior dated September 30, 1956, also recited that CNW owned all the stock, "[A]ll of the 20,000 share of capital stock of the Superior Coal Corporation, a corporation of the state of Illinois, are owned by Chicago and North Western Railway Company, a Wisconsin corporation, and all such shares are held in its name except for five Directors' qualifying shares."  Ex. 136, Consent to Dissolution dated September 30, 1956, at UP-ST094700; Ex. 239, accord Resolution of CNW Board of Directors dated September 30, 1956, at UP-ST197567.

The evidence demonstrates that from the inception of Superior, CNW and the Superior Directors intended that the Directors would hold the Directors' Shares for the benefit of CNW.  CNW contributed all the capital for the stock; the Directors paid nothing.  The Directors of Superior were also always officers or employees of CNW.  Ex. 89,  1935 History of Superior Coal and CNW, at SDSJ 162; Plaintiff's Post-Trial Brief (d/e 63),

Exhibit A, <u>Summary of Officers and Directors of Superior and CNW from 1936-55</u>.  When a Superior Director resigned, the successor Director became the owner of the share of stock previously owned by the resigning director.  The resigning Director did not receive any compensation for his ownership of one of the Directors' Shares, and the new Director did not pay anything for the stock.  <u>See</u> T. 58, at 238-40 (Hosfield).  The Directors further did not receive any dividends from Superior.  <u>Stipulation of Facts</u>, ¶ 6.  When Superior was dissolved, the remaining assets were distributed to CNW only, no assets were distributed to the Directors. <u>Stipulation of Facts</u>, ¶ 40.  The Directors always voted the five shares of stock with the 19,995 shares that CNW owned in its own name.  CNW consistently represented to the public and government agencies it owned all the stock of Superior.  The Court finds that from the inception of Superior and throughout Superior's existence and its dissolution, CNW and the Directors understood that CNW would make the entire capital investment in Superior for all of the Superior stock and receive all the benefits of ownership from the stock, and the directors would hold the Directors' Shares for the benefit of CNW.

II.   <u>Superior's General Operations and Relationship with CNW</u>

Once incorporated, Superior commenced mining operations.  During the first 10 years of operation, Superior opened Mines 1, 2, and  3 on the

Coal Lands.  In 1917, Superior opened Mine No. 4 on the Coal Lands. Ex. 101, <u>Report of Nye F. Morehouse, CNW Vice President and General Counsel dated March 12, 1953 (Morehouse 1953 Report)</u>, at UP-ST192639.

Superior mined coal to supply CNW.  Throughout its existence, Superior sold at least 95 percent of its coal production to CNW.  <u>Transcript of Trial Proceedings Volume 3 (d/e 60) (T. 60)</u>, at 666 (Schwartz); Ex. 193, <u>Deposition of Seth Schwartz dated February 16, 2017</u>, at 17.  Superior did not incur costs associated with marketing coal; it did not need to because it existed to serve its one customer, CNW.  <u>See</u> Ex. 103, <u>Supplemental Report of Nye F. Morehouse dated March 26, 1953 (Morehouse 1953 Supplemental Report)</u>, at UP-ST175410.

Over its approximately 54-year existence, Superior sold five percent of its total production to third parties.  From 1905 to 1914, Superior sold 5 to 20% of sales to third parties.  Beginning in 1947, Superior sold small particles of coal called screenings to third parties.  CNW could not use screenings in locomotive engines.  Beyond the sale of screenings, Superior sold small amounts of coal to employees for personal use.  <u>Transcript of Trial Proceedings Volume 2 (d/e 59) (T. 59)</u>, at 383-94 (Akers); T.60, at 650-51, 703-05 (Schwartz); Ex. 74, <u>Superior Annual Report for Year</u>

Ending December 31, 1947, at UP-ST003958; Ex. 264, Expert Report of Seth Schwartz dated August 3, 2018 (Schwartz Expert Report), at CM/ECF page number 42 of 48; Ex. 75, Superior Annual Report for Year Ending December 31, 1948, at UP-ST003974; Ex. 76, Superior Annual Report for Year Ending December 31, 1949, at UP-ST003990.

Superior's offices were located within CNW's offices in Chicago, Illinois. Superior's President reported to CNW's President. CNW's legal and accounting departments performed Superior's legal and accounting functions. Ex. 91, Collective Exhibit of Materials Filed Before the Illinois Supreme Court in *Superior Coal Company v. Department of Finance*, Ill. Sup. Ct. April 1941 Term Case No. 26166 (Supreme Court Filings), at GSD16-000140 – GSD16-000141; T. 58, at 179-81 (Hosfield); T. 60, at 569 (Hilton). Superior's corporate records, tax records, and land records were kept by CNW's secretary, land commissioner, and accountant. CNW's Insurance Department, Mechanical Department, as well as CNW's engineers and chemists, provided services to Superior. CNW's coal inspector and water supply supervisor held the same positions for Superior. T. 58, at 178-79 (Hosfield); Ex. 91, Supreme Court Filings, at GSD16-000139-140. Superior did not pay for the office space or these services. See T. 59, at 536-38 (Hilton).

Superior's accounting books and records, however, were kept separate from the records of CNW.  See T. 59, at 522-23 (Hilton).  Superior also maintained all necessary formalities of a separate corporation.  Superior held regular meetings of its board of directors and shareholders, kept separate corporate records and separate bylaws.  Ex. 89, 1935 History of Superior Coal and CNW, at SDSJ 165 – SDSJ 167; T. 59, at 489-90, 502-05, 514, 517-18, 523-25 (Hilton).  Superior and CNW issued separate annual reports.  See T. 59, at 525-26 (Hilton).  Superior and CNW had separate workforces and negotiated separate collective bargaining agreements with separate unions.  T. 59, at 450 (Akers); T. 59, at 519-21 (Hilton).  Superior paid its own bills out of its own accounts.  T. 59, at 505 (Hilton).  Superior kept records of its transactions with CNW on accounts payables and accounts receivables ledgers.  See Ex. 251, Superior Accounts Receivable Ledger for 1935; T. 59, at 507-08 (Hilton).

CNW and Superior executed agreements for coal sales for most years from 1919 to 1930.  Thereafter, CNW and Superior entered into multi-year agreements for the sale of coal.   The agreements, however, did not set prices or quantities of coal to be sold.  See Ex. 264, Schwartz Expert Report, at 43 of 48; Ex. 232, Ledger of Superior Contracts; T. 60 at 636-39, 674-75 (Schwartz).  In practice, CNW coal orders went through

Superior President Fred Pfahler.[6]  Pfahler also worked for CNW as its Coal Traffic Manager.  The general manager of CNW would notify Pfahler weekly of the quantities of coal needed and the locations for delivery. Pfahler prepared monthly "tonnage statements" in which he would estimate the price of the coal delivered for the month equal to the cash needed to meet ongoing expenses, or the cost of operating.  Ex. 91, Supreme Court Filings, at GSD16-000134 – GSD16-000135.  See Ex. 93, Superior Coal I, Record on Appeal to the Illinois Supreme Court (Superior Coal I Record on Appeal), at GSD6000078 – GSD600079,  GSD6000083, GSD6000105 – GSD6000108, GSD000115 (Testimony of Fred Pfahler before Department of Finance Hearing Examiner), and GSD6000240 (Letter from CNW General Purchasing Agent to Pfahler dated June 7, 1937 ordering coal for June 17, 1937); Ex. 109, CNW Finance Committee Minutes dated May 14, 1954, at UP-ST031831.

CNW secured coal from Superior for less than it would have paid to third-party suppliers.  Superior generally sold coal to CNW at cost or slightly above cost.  CNW also reduced its shipping costs by extending its rail lines to Superior's mines and thereby avoiding third-party shipping

---

[6] Pfahler was President of Superior from 1931 until he retired in June 1954.  In June 1954, he became chairman of the board of Superior.  See T 59, at 350 (Hosfield); T. 59, at 515-16 (Hilton).

costs.  Ex. 89, <u>1935 History of Superior Coal and CNW</u>, at SDSJ 164, SDSJ 170.  Ex. 103, <u>Morehouse 1953 Supplemental Report</u>, at UP-ST175410, UP-ST175411; Ex. 87, <u>Memorandum of Agreement between CNW and Superior dated December 27, 1934 (1934 Agreement)</u>, at UP-ST003297 – UP-ST003300; Ex. 91, <u>Supreme Court Filings</u>, at GSD16-000134 – GSD16-000135; T. 59, at 426-27 (Akers); T. 60, at 646-47, 700-01 (Schwartz).  CNW estimated that it paid $.73 per ton below the commercial price of coal during the eight months ending August 31, 1936.  Ex. 103, <u>Morehouse 1953 Supplemental Report</u>, at US-ST175410; see Ex. 83, <u>Agreement between Superior and CNW dated July 22, 1932 (1932 Agreement)</u>, at UP-ST024731 (Superior sold CNW coal "at a price lower than the railway company can purchase the same grade of coal elsewhere.").  <u>But</u> <u>see</u>, T. 59, at 404-14 (Akers) (Superior charged more than cost from 1919 to 1925 to fund capital investments); Ex. 83, <u>1932 Agreement</u> and Ex. 87, <u>1934 Agreement</u>, (Per these agreements, discussed in detail below, Superior charged $.20 per ton over cost from July 1932 to December 1934); T. 60, at 642 (Schwartz) (Superior charged more than cost of production from 1942 through 1953).

Superior showed a net profit over its 50 plus years of existence. CNW's expert Seth Schwartz opined that over the course of its existence,

Superior had total revenues of $221,757,257.00 and net income of $16,212,556.00, for a profit margin of 7.3%.  Ex. 197, <u>Expert Report of Seth Schwartz dated August 3, 2018</u>, Appendix B, <u>Supplemental Disclosure Statement of Set Schwartz Exhibit E Superior Coal Company Financial Results</u>. CNW's other expert Thomas Hilton opined that from 1926 to 1954, Superior had gross income of $147,742,602.96, and operating income from 1926 to 1954 to be $15,370,022.13, or 10.4% of total revenues.  Hilton deducted tax accruals and other losses and special expenses from operating income to calculate net income.   Hilton opined that Superior had net income from 1926 to 1954 of $6,825,345.00, for a profit margin of approximately 4.6%.  Ex. 266, <u>Supplemental Expert Report of Thomas E. Hilton, dated September 10, 2018</u>, at 4-27 – 4-29; see T. 60, at 597-98. After review of the calculations, the Court finds Hilton's calculations of net income are more accurate.  Schwartz' calculations appear comparable to Hilton's calculation of operating income, not net income.

The Fund argues that Superior always sold coal at cost to CNW, and so, did not earn a profit from those sales.  The evidence does not support such a finding.  The Court agrees that some of Superior's profits may have come from sales to third parties.  Also, some of the profit reflected money CNW funneled through Superior to pay CNW's creditors.  Some of the

profit reflected inaccuracies in estimates of costs of production during the ordering and billing process between Pfahler and the CNW General Manager.  See T. 58, at 100, 136 (Hosfield).[7]  Even so, the 4.6% profit margin cannot be explained away completely by these factors.  The evidence shows that Superior made a net profit from the sale of coal to CNW over the entirety of its existence.

From 1911 to 1952, Superior declared $14,725,000.00 in dividends, all of which were payable to CNW.  The parties have stipulated that these dividends were paid out of profits.  Stipulation of Facts ¶ 13.  Superior declared dividends 23 times during this period.  Six times the dividends were $1,000,000.00 or more.  In light of Hilton's calculations of Superior's net income, the $14,725,000 in dividends exceeded Superior's net income of $6,825,445.50.  At least some of these additional dividends were "paid" by accounting adjustments on each company's balance sheets.  As discussed in detail below, Superior's largest dividend of $2,150,000.00 to CNW in 1930 consisted of adjustments to the two companies' balance

---

[7] The expert witnesses agreed that a company can also show a net profit on its books through non-cash expenses for depreciation, depletion, and amortization.  T. 58, at 168-69 (Hosfield); T. 59, at 421:21-423 (Akers); T. 60, at 699-700 (Schwartz).  Schwartz and Hilton, however, accounted for these factors in their calculation of net income.  See Ex. 266, Supplemental Expert Report of Thomas E. Hilton, dated September 10, 2018, at 4-27 – 4-29; Exhibit 197, Expert Report of Seth Schwartz dated August 3, 2018, Appendix B, Supplemental Disclosure Statement of Set Schwartz Exhibit E Superior Coal Company Financial Results.

sheets rather than payments to CNW. Ex. 103, <u>Morehouse 1953</u>

<u>Supplemental Report</u>, at UP-ST175415.

      Up until 1953, when Superior began closing its operations, Superior

remained solvent regardless of price charged or dividends distributed to

CNW.  Hilton opined that from 1926 to 1953 Superior consistently

generated enough income to fund its operations.  Ex. 266, <u>Supplemental</u>

<u>Expert Report of Thomas E. Hilton, dated September 10, 2018</u>, at 4-5 ¶

9(a); T. 59, at 496-97, 499 (Hilton).  Hosfield and Akers agreed with this

opinion.  T 59, at 339 (Hosfield); T. 59, at 448, 476 (Akers).  Akers further

agreed that Superior did not lack sufficient capital to perform its functions

and meet its debts.  T. 59, at 448 (Akers); <u>see</u> <u>also</u> T. 59, at 496-97 (Hilton)

(Superior was adequately capitalized and made capital improvements "on a

regular and continuous basis.").  The Court finds these opinions to be

credible.  The Fund cites no evidence that Superior was ever unable to pay

its bills.  Even after Superior started closing operations in 1953, Superior

still paid all known creditors or provided reserves to pay them.[8]

      The Fund argues that Superior could only pay its bills because CNW

provided enough money on an ongoing basis to pay Superior's bills.  <u>See</u>

Ex. 91, <u>Supreme Court Filings</u>, at GSD16-000134 – GSD16-000135; T. 59,

---

[8] Superior's reserves to pay creditors are discussed below.

at 478 (Akers).  That observation does not show that Superior was insolvent.  Rather, that observation shows that CNW ensured that Superior had the assets and income necessary to pay its debts  The Court finds that Superior was solvent and able to pay its bills as they became due at least until it started the process of closing down its operations in 1953.  The Court further finds that after Superior began closing operations, Superior still paid its known creditors or provided reserves to pay its known creditors.

III.    Financial Transactions Between Superior and CNW

Unlike Superior, however, CNW had serious financial problems during the Great Depression in the 1930s.  CNW ultimately filed bankruptcy in 1935.  In the 1920s and early 1930s, Superior and CNW engaged in several financial transactions to improve CNW's financial condition.  In 1925, Superior purchased 700 preferred shares and 1,600 common shares of another CNW controlled company, the Chicago, St. Paul, Minneapolis, and Omaha Railway Company.  Superior then deposited the stock with the Central Union Trust Company of New York (Central Union Trust) pursuant to an agreement between CNW and Central Union Trust.  Ex. 1, Superior Minute Book Vol. 1, at UP-ST175802 – UP-ST175803.  No evidence indicates that Superior received a direct benefit from this transaction.

In 1930, Superior declared a $2,150,000.00 dividend which increased CNW's net worth by approximately $1,800,000.00 and decreased Superior's net worth by the same amount.  At the beginning of 1930, CNW owed Superior $1,064,421.62 for unpaid coal sales, plus additional debts of $550,000.00, for a total debt of $1,614,421.62.  Ex. 57, Superior Annual Report for Year Ending December 31, 1930 (Superior 1930 Annual Report), at UP-ST004075.  In 1930, Superior declared the $2,150,000.00 dividend payable to CNW as its stockholder.  Ex. 103, Morehouse 1953 Supplemental Report, at UP-ST175415.  The $2,150,000.00 dividend exceeded the combination of Superior's net income in 1929 and 1930 and its cash assets at the beginning and at the end of 1930.  Ex. 57, Superior 1930 Annual Report, at UP-ST00474.

Superior paid the $2,150,000.00 dividend to CNW by off-setting CNW's outstanding $1.6 million debt and by borrowing approximately $550,000.00 from CNW.   At least $1,000,000.00 of these dividends were credited to an intercompany account of CNW.  Ex. 191, Deposition of Thomas Hilton (Hilton Deposition), at 22-24; T 60, at 586-87 (Hilton).  An intercompany account is used to track transactions between companies under common control.  T. 60, at 590 (Hilton).  At the end of 1930, CNW owed Superior $371,034.55 in unpaid coal sales, but Superior owed CNW

$553,303.17 largely from the loan used to fund the dividend transaction, resulting in Superior owing a net debt of $182,268.62 to CNW. Ex. 57, Superior 1930 Annual Report, at UP-ST00474.  As a result of these transactions, CNW's net worth increased by approximately $1,800,000.00 because it no longer owed Superior $1.6 million and Superior now owed it approximately $180,000.00.  Conversely, Superior's net worth decreased by approximately $1,800,000.00 because CNW no longer owed it $1.6 million and it now owed CNW approximately $180,000.00.  See T. 59, at 417-20 (Akers); T. 60, at 590-92 (Hilton).

In 1932, CNW had a net operating deficit of $11,216,820.37.  Ex. 23, CNW Annual Report for year ending December 31, 1932 (1932 CNW Annual Report), at UP-ST078565.  CNW began borrowing large amounts of funds from the federal government's Great Depression Era Reconstruction Finance Corporation (RFC Loan).  The RFC Loan required CNW to make quarterly payments of $100,000.00, totaling $400,000.00 per year.  On July 22, 1932, CNW contracted with Superior (1932 Agreement) to make the quarterly payments on the RFC Loan.  Under the 1932 Agreement, CNW agreed to purchase at least 2,000,000 tons of coal annually at a price of 20 cents ($.20) per ton over cost of production.  The price resulted $400,000.00 in annual income to Superior over the cost of production.

Superior agreed to issue dividends of $400,000.00 annually ($100,000.00 each quarter). CNW assigned its rights to the dividends to the Reconstruction Finance Corporation to satisfy the quarterly payments due on the RFC Loan. Ex. 83, 1932 Agreement, at UP-ST024731, UP-ST024733; See Ex. 87, 1934 Agreement, at UP-ST003297 - UP-ST003298.

On April 11, 1932, Superior deposited $50,000.00 with CNW "to be held and used for and on account of the Superior Coal Company." Ex. 1, Superior Minute Book, Vol. 1, at 175880. On December 28, 1932, $19,500.00 remained from the $50,000.00 that Superior deposited with CNW in April of that year. Neither party presented evidence of how the $30,500.00, from the initial $50,000.00 deposit, was spent. Superior used the remaining $19,500.00 to purchase debentures issued by CNW in 1933 (1933 Debentures), effectively loaning the money to CNW. The Superior Board of Directors authorized CNW's treasurer to purchase the 1933 Debentures. Ex. 1, Superior Minute Book Vol. 1, at UP-ST175890.

In 1933, CNW's financial problems continued, and Superior continued to assist CNW. In 1933, CNW had a net operating deficit of $7,875,418.69. 1932 CNW Annual Report, at UP-ST078629. CNW had approximately $6.3 million in 1933 Debentures that came due on May 1, 1933, and

approximately $7.7 million mortgage bonds issued in the name of a CNW subsidiary, the Fremont, Elkhorn, and Missouri Valley Railroad Company (Fremont Bonds), that came due on October 1, 1933.  CNW could not pay the principal balance at maturity or refinance either the 1933 Debentures or the Fremont Bonds.  CNW offered the bond and debenture holders 50% of redemption value in cash and 50% in CNW general mortgage bonds.  CNW borrowed the money from the Reconstruction Finance Corporation to fund the 50% cash payout.  By the end of 1933, the principal balance of the RFC Loan increased to $15,441,200.00.  Ex. 24, <u>CNW Annual Report for the Year Ending December 31, 1933</u>, at UP-ST078630 – UP-ST078631.

Superior owned $37,000.00 of the 1933 Debentures.  Superior's Board of Directors voted to accept the refinancing of 50% in cash and 50% in CNW mortgage bonds.  The records from Superior's Board of Directors state that CNW agreed to pay a 10% cash advance upon surrender of the debentures.  Superior directed the treasurer of CNW to retain the 10% cash advance and to buy more 1933 Debentures with the funds.  Ex.1, <u>Superior Minute Book Vol. 1</u>, at UP-ST175891 – UP-ST17589.  Buying more of the 1933 Debentures further reduced CNW's debt owed to third parties not owned by CNW.

In addition, in June 1933 Superior purchased $350,000.00 in Fremont Bonds and accepted the CNW refinancing proposal.  Superior again authorized the CNW treasurer to keep the 10% advance cash payment to buy more Fremont Bonds.  In September 1933, Superior purchased additional Fremont Bonds.  Superior again directed CNW's treasurer to retain the 10% cash advance from the Fremont Bond refinance to buy more Fremont Bonds.  Id. at UP-ST175897 – UP-ST 175899, UP-ST175902 – UP-ST175907.  Again, Superior thereby reduced CNW's debt to parties not owned by CNW.

In 1934, CNW had net operating deficit of $8,276,193.80.  Ex. 25, CNW Annual Report for the year ending December 31, 1935 (1935 CNW Annual Report), at UP-ST078692.  On or about May 1, 1934, CNW borrowed up to $250,000.00 on a short-term loan from Chase National Bank and National City Bank, both of New York City (Bank Loan).  The two banks demanded mortgage bonds issued by CNW with a $500,000.00 par value as collateral for the $250,000.00 loan.  Superior owned $500,000 par value CNW general mortgage bonds.  Superior pledged its bonds as collateral for the Bank Loan to CNW.  By August 1935, CNW had repaid the Bank Loan and the two banks had returned the bonds to Superior.  See

Ex. 89, <u>1935 History of Superior Coal and CNW</u>, at SDSJ 168 - SDSJ 169;

Ex. 1, <u>Superior Minute Book Vol 1.</u>, at UP-ST175914 – PU-ST175915.

Also, in 1934, CNW refinanced approximately $4.5 million in bonds that matured January 1, 1935 (1934 Bonds). CNW again offered 50% in cash (again borrowed from the Reconstruction Finance Corporation), and 50% in long-term mortgage bonds. Ex. 25, <u>1935 CNW Annual Report</u>, UP-ST078694. Superior again owned some of the 1934 Bonds. On October 31, 1934, Superior accepted the refinancing terms and authorized the cash from the refinancing to be used to purchase additional 1934 Bonds, again reducing CNW's debt to parties not owned by CNW. Ex. 1, <u>Superior Minute Book, Vol.1</u>, at UP-ST175923 – UP-ST175924.

In December 1934, the Reconstruction Finance Corporation agreed to waive CNW's obligation to make five quarterly payments on the RFC Loan due December 31, 1934 through December 31, 1935. Superior agreed to stop charging CNW $.20 per ton over the cost of production for coal and CNW agreed to relieve Superior of the obligation to declare the $400,000.00 annual dividend. Superior further agreed to sell coal to CNW at cost from October 1, 1934 to December 31, 1935. Ex. 87, <u>1934</u>

Agreement, at UP-ST003300; see Ex. 89, History of Superior Coal and CNW, at SDSJ 169 – SDSJ 170.[9]

On June 27, 1935, CNW officially decided to default on bonds totaling $29,464,891.50 in principal and interest set to mature on December 31, 1935. The next day, June 28, 1935, CNW filed bankruptcy. A court-appointed trustee took over CNW's property and operations. CNW had a net operating deficit in 1935 of $11,070,348.25. Ex. 26, CNW Annual Report for the year ending December 31, 1935 (1935 CNW Annual Report), at UP-ST078755, UP-ST078756. CNW remained in bankruptcy until 1944.

IV.    The Sales Tax Dispute

In 1935, Superior had a dispute with the Illinois Department of Finance over whether Superior owed Retailers' Occupation Tax (Sales Tax) on coal sales to CNW. The Department of Finance sought Sales Taxes on coal sales from July 1933 to May 1935. Stipulation of Facts ¶ 16. Superior took the position that its coal sales to CNW were not subject to

---

[9] The 1934 Agreement indicated that prior to entering 1932 Agreement, Superior sold coal at cost to CNW:

> WHEREAS, on account of said contract of July 22, 1932, said Railway Company has been required to pay greatly increased amounts for its coal, so that the true cost of coal to said Railway Company during the greater part of the year 1934 and at the present time is overstated at least to the extent of such excess over cost of production which excess represents not the cost of the coal but amounts repaid by said Railway Company of sums borrowed by said Railway Company from said Reconstruction Finance Corporation; . . . .

Ex. 87, 1934 Agreement, at UP-ST003299.

Sales Taxes because Superior was a department of CNW and not really a separate corporation, "At all times since its organization, the Superior Coal Company has been under the complete domination and control of the Railway Company as a mere branch or department of the Railway Company's business." Ex. 89, History of Superior Coal and CNW, at SDSJ 164. According to Superior's court filings during the Sales Tax dispute, the "sales" of coal were really intradepartmental transfers within CNW, not sales subject to Sales Tax. Ex. 91, Supreme Court Filings, at GSD16-000133 – GSD16-000135. Superior further asserted in court filings that:

> The Coal Company is without funds except as supplied by the Railway Company for coal; the "price" of coal is fixed by the unilateral determination of the Railway Company management; nominal Coal Company officers are subordinate to the railroad executive officers; and under the routine observed the so-called "sales" are handled as interdepartmental transactions except for the employment of certain of the formal indicia of sales.

Ex. 91, Supreme Court Filings, at GSD16-000133.

CNW and Superior also memorialized the description of Superior as a department of CNW in the 1934 Agreement:

> WHEREAS, for many years said Coal Company has, although constituting a separate corporation, been managed and operated, and its properties managed and operated, as a branch or department of said Railway Company, and wholly in in its interest; . . . .

Ex. 87, 1934 Agreement, at UP-ST003297.

The Sales Tax dispute went through the administrative process and judicial review until it reached the Illinois Supreme Court. The Illinois Supreme Court issued its decision in 1941. Superior Coal Co. v. Department of Finance, 377 Ill. 282, 36 N.E.2d 354 (Ill. 1941) (Superior Coal I). The Supreme Court stated that a corporation cannot assert the equitable alter ego doctrine to pierce its own the corporate veil to avoid liability for taxes. The Supreme Court found that, for tax purposes, Superior was a separate corporation from CNW, and so, had to pay Sales Tax on coal sales to CNW. Superior Coal I, 377 Ill. at 294-95, 36 N.E.2d at 360.

V.    Superior's Final Years

On June 1,1944, CNW emerged from bankruptcy. Ex. 35, CNW Annual Report for the Year Ending December 31, 1944, at UP-ST029150; see Ex. 103, Morehouse 1953 Supplemental Report, at UP-ST175415; T. 59, at 424 (Akers). On July 28, 1944, Superior agreed to exchange $637,500.00 in CNW general mortgage bonds for "new securities provided for in the Plan of Reorganization of Chicago and North Western Railway Company." Ex. 1, Superior Minute Book Vol. 1, at UP-ST716024.

Superior did not pay any dividends to CNW from 1935 to 1945 including the time that CNW was in bankruptcy. In 1946 and 1949,

Superior paid dividends of $1,500,000.00 and $1,150,000.00, respectively. Ex. 103, Morehouse 1953 Supplemental Report, at UP-ST175415 – UP-ST175416.

In the late 1940s, CNW converted its railroad operations from coal-fired locomotives to diesel-powered locomotives.  Beginning in 1947, CNW no longer needed coal to fuel its locomotives.  CNW's demand for coal from Superior dropped from 463,000 tons in 1947 to 86,000 tons in 1953.  Ex. 103, Morehouse 1953 Supplemental Report, at UP-ST175411;  see Stipulated Facts, ¶ 10.

In 1947, Superior started selling coal commercially to third parties. From 1947 to 1952, Superior sold fine pieces of coal called screenings to third parties.  During this period, Superior had annual net revenues of $161,000.00 from sales of screenings.  Ex. 101, Morehouse 1953 Report, at UP-ST192640.

On May 7, 1951, Superior abandoned Mine No. 1 as no longer economically viable.  Superior commenced salvage operations to dispose of equipment and supplies related to the operation of Mine No. 1.  Ex. 2, Superior Minute Book Vol. 2, at UP-ST191889 – UP-ST191890.

On March 12, 1953, Nye Morehouse, Vice President of Superior and Vice-President and General Counsel of CNW, wrote the Morehouse 1953

Report.  Morehouse stated that Superior had 18,881 acres of virgin coal reserves with a recoverable coal estimate of 117,076,407 tons.  Ex. 101, Morehouse 1953 Report, at UP-ST192639.   According to Morehouse, Pfahler estimated the going concerns value of 18,881 acres of virgin coal rights to be $50 an acre.  Morehouse reported that the estimated market value of Superior's 1,100 acres of the Coal Lands held in fee ownership not to be in excess of $1,000,000.00.  Morehouse said that these estimates assumed a buyer interested in purchasing Superior as a going concern. Morehouse said that the liquidation or salvage value of the Coal Lands would be far less.  Ex. 101, Morehouse 1953 Report, at UP-ST192642. Morehouse estimated the value of Superior as a going concern at $4,500,000.00 and estimated its salvage value at $736,000.00.  Morehouse explained that the equipment was old and had very little salvage value.  Ex. 101, Morehouse 1953 Report, at UP-ST192642.

Morehouse stated Pfahler was in negotiations with Olin Industries, Inc. (Olin), about a possible purchase of Superior's assets.  Olin was interested in constructing an aluminum plant and wanted a location that provided a supply of coal.  The negotiations were continuing.  Ex. 101, Morehouse 1953 Report, at UP-ST192643 – UP-ST192647.

On March 26, 1953 Morehouse wrote the Morehouse 1953 Supplemental Report. Morehouse recommended (1) continuing limited operations of Superior for five years while selling Superior's remaining Coal Lands to Olin to supply a proposed aluminum plant; or (2) selling Superior's assets on condition that the purchaser agree to supply CNW's coal needs for five years at an acceptable price for the coal. Stipulation of Facts ¶ 17; Ex. 103, Morehouse Supplemental 1953 Report, at UP-ST175414.

On August 7, 1953, Superior abandoned Mine No. 2 as not economically viable. Superior started salvage operations to sell Mine No. 2 equipment and supplies. Ex. 80, Annual Report of Superior Coal Company for the year ending December 31, 1953 (Superior 1953 Annual Report), at UP-ST003891.

On March 31, 1954, Morehouse wrote a memorandum to President Feucht regarding Superior. Ex. 104, Memorandum to P.E. Feucht, CNW President dated March 31, 1954 (Morehouse 1954 Memorandum). Morehouse reported that the efforts to sell Superior had been unsuccessful. Attempts were made to sell Superior to nine corporations, including Olin, Union Carbide & Carbon Corp., United States Steel Corporation, and Commonwealth Edison. Morehouse recommended implementing a plan to salvage and dispose of Superior's assets. Morehouse reported that the

estimated salvage value of Superior's remaining equipment was now

$150,000.00.  The number was reduced from the March 1953 estimate

because Superior had already sold equipment from Mine No. 1 and part of

the equipment from Mine No. 2.  Morehouse also reviewed the state of

relevant coal markets and the financial condition of Superior.  Id. at UP-

ST175430 – UP-ST174438.   Morehouse recommended selling Superior's

assets or shutting down its mining operations as soon as possible.

Morehouse also reported that Pfahler wanted to retire from the position of

President of Superior.  Morehouse said that at the request of CNW

management, Pfahler agreed to retire from the position of President, but re-

enter service with Superior in another capacity to supervise salvage

operations.  Stipulation of Facts ¶¶ 18, 19; Ex. 104, Morehouse 1954

Memorandum, at UP-ST175439.

CNW retained the outside engineering firm of Coverdale & Colpitts

(Coverdale) to review the present status of Superior and to make

recommendations regarding the advisability of continuing Superior's

operations.  On April 6, 1954 Coverdale issued a report to President

Feucht.  Stipulation of Facts ¶ 20; Ex. 105, Report of Coverdale & Colpitts

(Coverdale Report), UP-ST175441 – UP-ST175444.  Coverdale reviewed

"the present status and future prospects of Superior Coal Company, the

coal mining subsidiary of the Chicago and North Western Railway Company, with the object of determining the advisability of continuing that subsidiary's operations."  Id. at UP-ST175441.  Coverdale representatives inspected Superior's facilities, reviewed Superior's records, and reviewed data from other studies of regional fuel supplies.

Coverdale stated that because CNW switched to diesel locomotives, Superior's coal production decreased 3,070,000 tons in 1947 to 779,000 tons in 1953.  CNW was scheduled to add 37 more diesel locomotives further reducing its coal demands.  Coverdale estimated that CNW's demand for coal would reduce to 300,000 to 500,000 tons of coal, primarily for power plants at train stations rather than for locomotives.  CNW could purchase the needed coal from other sources for less than Superior's cost of production.  Thus, CNW did not benefit from keeping Superior operating to meet its need for coal.  Ex. 105, Coverdale Report, at UP-ST175442.

Coverdale also concluded that Superior could not compete with other producers in the commercial market for coal.  Coverdale stated:

> We believe that Superior's present mines would be unable to compete in the commercial coal market. While the longer term outlook – a generation hence – may be favorable because of the expected growth in requirements for the utility, metallurgical and chemical industries, there appears no immediate prospect for a revival in coal demand, particularly in view of the quantities of natural gas now available to important markets for Illinois coal.

Ex. 105, <u>Coverdale Report</u>, at UP-ST175443. Coverdale ultimately

recommended shutting down Superior:

### 6. Recommendations

Because of the present small demand for coal on the Chicago and North Western Railway System and the indicated further decline in such demand, the high cost of mine operation on such a limited basis and the availability of higher-quality washed coals at favorable prices when compared to Superior Coal Company 's production costs, we recommend early termination of the operations of that subsidiary.

The principal asset in liquidation of Superior Coal Company appears to be the rights it owns to mine the approximately 144 million tons of unassigned coal remaining. We believe efforts should be continued to dispose of those rights to consumers in territories enjoying low freight rates from the [Macoupin County] area or to an operator prepared to open a new mine equipped with modern, high-capacity, continuous mining and haulage machinery who would serve such territories.

If the coal rights cannot be disposed of on a favorable basis, their retention for the long pull would appear logical, provided carrying charges can be reduced to a nominal level.

Ex. 105, <u>Coverdale Report</u>, at UP-ST175444.

The minutes of the May 14, 1954 meeting of the CNW Finance

Committee stated:

No sale or other disposition of the Coal Company or any part of its properties having been found possible, it is planned to call a special meeting of the stockholders of the Superior Coal Company at which resolutions will be proposed to discontinue mining operations of June 1, 1954.

Ex. 109, <u>CNW Finance Committee Minutes dated May 14, 1954</u>, at UP-ST031831.  The Finance Committee also approved the proposal to allow Pfahler to resign and then be rehired to supervise salvaging operations to dispose of Superior's assets.  Pfahler would continue to work for CNW as its Coal Traffic Manager.  Half of Pfahler's salary would be paid by CNW and half by Superior during salvage operations.  <u>Id</u>.

On May 24, 1954, Superior's stockholders unanimously passed a resolution, which stated, in part:

> [I]t appears from reports presently before the stockholders that the continuation of coal production by the Superior Coal Company cannot be carried on profitably for the future and the Chicago North Western Railway System's greatly reduced requirements for coal may be obtained more reasonably from other sources.

Ex. 2, <u>Superior Minute Book, Vol. 2</u>, at UP-ST191931; <u>see</u> <u>Gillespie</u>, 2015 IL App (4th) 140877, ¶ 37; <u>Stipulation of Facts</u> ¶ 21.  Therefore, the stockholders resolved:

> That the Board of Directors and President of the Superior Coal Company be and they are authorized and directed to take appropriate action to discontinue active mining operations … and carry out a program for the permanent closing and abandonment of mine Nos. 3 and 4, and the orderly salvaging and disposition of materials and equipment thereof . . ., excluding however, the unmined coal lands and coal rights of said Coal Company and its other mineral rights.

Ex. 2, Superior Minute Book, Vol. 2, at UP-ST191931; see Gillespie, 2015 IL App (4th) 140877, ¶ 37; Stipulation of Facts ¶ 21. Four days later, Superior's Board of Directors passed a resolution putting Pfahler in charge of salvage operation and creating the position of chairman of the board for him. Ex. 2, Superior Minute Book, Vol. 2, at UP-ST191933, UP-ST191940; Stipulation of Facts ¶ 22. Superior closed its last operating mine, Mine No. 4, in 1954. Stipulation of Fact ¶ 23.

Pfahler ran the Superior salvage operation from June 1, 1954 until he resigned on July 31, 1955. Ex. 82, Annual Report of Superior Coal Company, for the year ending December 31, 1955 (1955 Superior Annual Report), at UP-ST001900. Salvage operations were completed in September 1955. Progress Report on Salvage Operations dated October 4, 1955 (October 1955 Progress Report), at UP-ST032545 – UP-ST032546; see Stipulation of Facts ¶ 24; . CNW was given first choice to purchase any supplies and equipment during the salvage operation. Ex. 82, 1955 Superior Annual Report, at UP-ST001902.

On June 21, 1954, Superior's Board of Directors authorized the sale of all CNW securities held by Superior, consisting of mortgage bonds in the principal balance of $308,600.00, 2,844 shares of CNW preferred stock, and 273 shares of CNW common stock. Ex. 2, Minute Book of the

Superior Coal Company, Vol. 2 (Superior Minute Book Vol. 2), at UP-ST191944.  Superior incurred a $210,000 capital loss in liquidating these securities.  Ex. 126, CNW Memorandum Subject "Superior Coal Company'" dated July 10, 1956 (July 10, 1956 CNW Memorandum), at UP-ST094654.

On May 24, 1955, the Superior Board of Directors approved the following resolution to set aside reserves for outstanding obligations of Superior:

> RESOLVED, That in view of the fact the Superior Coal Company is no longer an operating company the Comptroller be and hereby is authorized to make such entries in the accounts of the Coal Company as will accurately reflect all deferred and other obligations of said Coal Company by setting up appropriate reserves or in some other manner indicating outstanding obligations of the Coal Company that have not been accrued.

Ex. 2, Superior Minute Book Vol. 2, at UP-ST191973.

On October 3, 1955, an area of mine subsidence began in Gillespie, Illinois.  The subsidence affected 26 houses in an area of about two city blocks.  The area was adjacent to an area that subsided in 1944.  The 1944 subsidence resulted in over $65,000.00 in claims paid to landowners by Superior.  Some claims on the new subsidence were paid in 1955.  As of October 4, 1955, Superior established a reserve of $20,000.00 to cover subsidence claims.  October 1955 Progress Report, at UP-ST032545.  Superior reported at the end of 1955 that it had established a reserve

based on "the company's previous claim experience." 1955 Superior Annual Report, at UP-ST001903.  On November 23, 1955, the Superior Board of Directors discussed subsidence which occurred on October 3, 1955 and increased the reserve for mine subsidence claims to $175,000.00.  Ex.2, Superior Minute Book Vol. 2, at UP-ST191983.

In 1956, Superior attempted to sell its Coal Lands.  In February of 1956, Morehouse wrote to J.E. Goodwin, CNW's Executive Vice President, advising of inquiries from prospective purchasers of Superior's coal rights, including the Coal Lands.  Morehouse continued negotiating in March and April 1956 with a potential purchaser Midland Electric Coal Corporation (Midland).  The effort to negotiate a sale of the Coal Lands to Midland was not successful. See Stipulation of Facts ¶ 25; Ex. 237, Letter from Morehouse to Goodwin dated February 24, 1956; Ex. 121, Letter from Morehouse to Goodwin dated March 30, 1956; Ex. 122, Letter from Morehouse to Goodwin dated April 3, 1956.[10]

On February 7, 1956, the accounting firm of Peat, Marwick, Mitchell & Co drafted a letter addressed to Executive Vice President Goodwin. Stipulation of Facts ¶ 26; Ex. 119, Letter dated February 7, 1956 (Peat

---

[10] The Stipulation of Facts states that "In March of 1956, Nye Morehouse authored a report on attempts to dispose of  some or all of Superior's assets."  Stipulation of Facts ¶ 27.  The Stipulation of Facts does not identify whether the report is in evidence and does not indicate the substance of the report.

Marwick Letter).  The Peat Marwick Letter said that CNW carried a

$2,000,000.00 investment in Superior on its books.  Superior was in the

process of being liquidated, and in that process, charges were taken to

reduce Superior's net worth due to sales tax liabilities, subsidence claims,

and other liabilities.  The charges totaled $1,126,654.62.  As a result,

Superior's books showed a deficit of $1,014,142.36.  Peat Marwick

recommended that CNW establish a reserve to cover the $1,014,142.00

deficit instead of writing down the $2,000,000.00 investment in Superior.

Ex. 119, Peat Marwick Letter, at UP-ST163196.

On April 1, 1956, additional mine subsidence occurred in the outskirts

of Gillespie, Illinois.  The subsidence affected three houses, including a

farmhouse on six acres south of Gillespie.  Ex. 2, Superior Minute Book

Vol. 2, at UP-ST191990.

On April 4, 1956, a person identified as Special Representative

Lawrence Kiss reported to the Superior Board of Directors on the status of

the subsidence claims from the 1955 subsidence.  Ex. 2, Superior Minute

Book Vol. 2, at UP-ST191989, UP-ST191991 – UP-ST191992.  Kiss

estimated that the outstanding unliquidated claims totaled approximately

$140,000.00.  The Superior Board of Directors determined the current

remaining reserve of $172,926.00 for subsidence claims to be adequate. Ex.2, Superior Minute Book Vol. 2, at UP-ST191992.

At a special meeting of Superior's stockholders in May of 1956, Lowell Hastings and Larry Provo were elected as Superior Directors. Two days later, at a meeting of Superior's Board of Directors, Provo was elected President of Superior. (UP 122650-652). Stipulation of Facts ¶ 28, 29.

On July 10, 1956, Arthur Andersen & Co. issued a memorandum regarding the tax effects of dissolving Superior. Ex. 131, Letter dated August 28, 1956 (August 28, 1956 Letter), attached Chicago and North Western Railway Company Memorandum Subject: Superior Coal Company (Arthur Andersen Report), at UP-ST094650 – UP-ST094661.[11] The Arthur Andersen Report showed that as of December 31, 1955, Superior had reserves for pensions, personal injury claims, and subsidence claims. The reserve for subsidence claims was $172,926.00. Id. at UP-ST094652.[12] Arthur Andersen assumed that in any sale of Superior, CNW would have to assume responsibility for the subsidence claims covered by the reserves, "In addition, we have assumed that [CNW] will have to become liable for the estimated liabilities for pension, personal injuries and

_____

[11] The Court cannot determine whether document submitted as evidence includes the entire Arthur Andersen Report.
[12] The amount was reduced from $175,000.00 because some claims had already been paid from the reserves.

property subsidence previously discussed." Id. at UP-ST094655. Arthur Andersen addressed the tax advantages and disadvantages of selling Superior's assets, selling Superior's stock, and dissolving Superior. Id. at UP-ST094655 – UP-ST094661.

On August 28, 1956, CNW's vice president and general counsel, Lowell Hastings, drafted a memorandum from the CNW Legal Department to CNW's chairman, Ben W. Heineman. Ex. 131, August 28, 1956 Letter, at UP-ST094649. The purpose of the memorandum was to "address the question of liquidating Superior Coal Company into the Chicago and North Western Railway Company." Hastings indicated that the tax considerations weighed in favor of dissolving Superior. Hastings enclosed the Arthur Andersen Report with the August 28, 1956 Letter. Id.

Hastings also commented on the potential for subsidence claims:

In this connection we have not overlooked the problems with respect to subsidence claims. In recent years there have been a number of such claims, all of which have either been paid or provided for by a reserve which appears to be adequate. Although the possibility of further subsidences will continue to exist we have been advised by Mr. Pfahler, former President or the Coal Company, who, of course, is very familiar with the properties, that there is no reason to anticipate further difficulty except to a limited extent adjacent to the present subsidences.

Id.; see Gillespie, 2015 IL App (4th) 140877, ¶ 42. Stipulation of Facts ¶ 30. Hasting concluded:

It is our recommendation that the Superior Coal Company be dissolved, that its assets be transferred to the Chicago and North Western Railway Company and that the Railway Company assume such of its liabilities as cannot be fully liquidated prior to such dissolution.

Id.; see Gillespie, 2015 IL App (4th) 140877, ¶ 41. Stipulation of Facts ¶ 29.

On September 14, 1956, the CNW board voted that Superior should:

be dissolved, that its assets be transferred to this Company [CNW], and that this Company assume its liabilities (in the event that such liabilities cannot be fully liquidated prior to the time a certificate of dissolution has been issued by the Secretary of State of Illinois)."

* * *

FURTHER RESOLVED, that this Company assume any liabilities of the Superior Coal Company (subject to applicable Statutes of Limitations) that cannot be fully liquidated prior to the time a certificate of dissolution has been issued by the Secretary of State of Illinois." (UP 120135-136).

Stipulation of Facts ¶ 31.

On September 30, 1956, Superior's shareholders executed a

"Consent to Dissolution."  The Consent to Dissolution stated:

WHEREAS, by resolution of the Board of Directors of the Chicago and North Western Railway Company, duly adopted September 14, 1956 it  was resolved that the proper  officers of the Chicago and North Western Railway Company arrange for the dissolution of the Superior Coal Company, in accordance with the provisions of The Business Corporation Act of Illinois relating to voluntary dissolution of business corporations, and that, to that end, they cause a written consent that the Superior Coal Company be dissolved to be executed in accordance with the provisions of Section 75 of The Business Corporation Act;

NOW THEREFORE Said Chicago and North Western Railway Company, the owner of all of the outstanding shares of capital stock of the Superior Coal Company, and all of the undersigned individuals, who are all of the Directors of said company, each holding one such share of record (who together constitute all of the shareholders of record of said Superior Coal Company), hereby consent that the said Superior Coal Company shall be dissolved in  accordance with the provisions of The Business Corporation Act of Illinois.

Ex. 136, <u>Consent to Dissolution dated September 30, 1956</u>, at UP-ST094700; <u>accord</u> Ex. 239 <u>Resolution of CNW Board of Directors dated September 30, 1956</u>, at UP-ST197567; <u>see</u> Ex. 182, <u>Fund v. CNW</u>, Cook County, Illinois Circuit Court No. 84-L-6949, <u>Request to Admit</u>, ¶ 19.

On October 12, 1956 the directors of Superior ratified the Consent to Dissolution.  <u>Stipulation of Facts</u> ¶¶ 32, 33.  When the decision to dissolve Superior was finalized, its five Directors were Larry Provo, Nye Morehouse, Frederick Linstead, Lowell Hastings and Fred Pfahler. Each voted to dissolve Superior.  <u>Stipulation of Facts</u> ¶ 34.  Each Superior Director except Pfahler was also an officer of CNW both before and after the Superior Dissolution.  <u>Stipulation of Facts</u> ¶¶ 35-38.  Pfahler was CNW's Coal Traffic Manager.  Ex. 109, <u>CNW Finance Committee Minutes dated May 14, 1954</u>, at UP-ST031831.

On October 18, 1956, the CNW Accounting Department prepared a statement for Superior on the status of subsidence claims from the October

1955 subsidence in Gillespie, Macoupin County, Illinois.  The statement

showed that Superior had paid out $22,869.40, leaving a balance in the

reserve of $152,130.60.  Superior had paid 14 claims as of the date of the

report.  The average claim per house was $1,528.00.  Ex. 147, Superior

Coal Company Statement of Subsidence Claims dated October 18, 1956,

at UP-ST163096.

On October 31, 1956, Superior's balance sheet showed capital stock

of  $2,000,000. Superior also had a reserve of $128,491.00 to cover known

mine subsidence claims.  Ex. 153, Superior Balance Sheet as of October

31, 1956, compared with September 30, 1956, and December 31, 1955

(October 31, 1956 Balance Sheet), at UPST023111.

On December 14, 1956, the CNW Accounting Department prepared

another statement of the status of subsidence claims through November

30, 1956.  By that date, Superior had paid a total of 16 claims totaling

$47,709.40, leaving a reserve of $127,290.60.  The average amount paid

on each claim increased to $2,880.00.  Ex. 155, Superior Coal Company

Statement of Subsidence Claims dated October 18, 1956, at UP-

ST001909.

In December of 1956, Superior transferred to CNW all its remaining

assets, including the Coal Lands, as well as land in Iowa.  The deed of

transfer to the Coal Lands was executed by Provo (president of Superior) and Vik (secretary of Superior). <u>Stipulation of Facts</u> ¶ 39-40; Ex. 162, <u>Deed of Transfer dated December 28, 1956</u>; Ex. 157, <u>CNW General Ledger Entries for December 1956 (1956 CNW General Ledger)</u>, at UP-ST114046.

Superior also transferred to CNW its reserves for known liabilities, including pensions and welfare liability, personal injury claims, and known mine subsidence claims. The subsidence reserve transferred as of December 1956 was $124,834.60. Ex. 157, <u>1956 CNW General Ledger</u>, at UP-ST114046; <u>see</u> <u>Gillespie</u>, 2015 IL App (4th) 140877, ¶ 48; T. 60, at 606-08 (Hilton).

Superior filed its Articles of Dissolution on February 27, 1957. The Illinois Secretary of State issued a Certificate of Dissolution that day. <u>Stipulation of Facts</u> ¶¶ 41-42. CNW ultimately paid all subsidence claims that were known at the time of the Superior Dissolution. T. 60, at 607 (Hilton).

Based on the foregoing evidence, the Court finds that CNW attempted to sell Superior as a going concern, but those efforts were unsuccessful. The Court finds that CNW thereafter decided to cease Superior's business operations and to dissolve Superior. The Fund's

expert Hosfield opined that Superior changed its business operations from mining coal to holding the Coal Lands. See e.g., T 59, at 291 (Hosfield Testimony); Ex. 260, Expert Report and Disclosure of Mark J. Hosfield, dated May 15, 2018, at 16. The Court finds that this opinion is contrary to the facts and entitled to no weight. None of the evidence indicates that either CNW or Superior intended for Superior to engage in a business enterprise of holding the Coal Lands. All of the evidence shows that CNW wanted either to sell Superior as a going concern or to cease Superior's operations and liquidate its assets. Superior's Board of Directors authorized the Comptroller to set up reserves for outstanding obligations because Superior was no longer an operating company. Superior sold its equipment and supplies for salvage. Superior tried to sell the Coal Lands, but the efforts were not successful. Superior could not sell the Coal Lands because the Coal Lands contained high sulfur coal that was less valuable than low sulfur coal available from other parts of the United States. Superior's Coal Lands contained high sulfur coal that was less valuable and less marketable than competing low sulfur coal available from other sources. See T. 60, at 645 (Schwartz); see also T. 59, at 458, 465-66 (Akers). Superior distributed the remaining unsold assets, including the Coal Lands, to CNW as its stockholder as part of the Superior Dissolution.

The Fund notes that the corporate charter stated that Superior's purpose was "to mine and sell coal, and for that purpose to acquire, own and lease such lands and to acquire and hold such coal rights, and such other real and personal estate as may be necessary'" The Fund argues that owning the Coal Lands was always one Superior's business purposes. The Court disagrees. The plain language of the corporate charter is contrary to both the opinion of Hosfield and the Fund's position. The charter stated that the purpose was "to mine and sell coal," and "for that purpose," Superior owned coal lands. Superior's charter, therefore, stated that Superior would own coal land and mineral rights in order to mine coal. Once Superior ceased mining, it had no reason to own land or mineral rights. That is why Superior tried to sell the Coal Lands. No evidence supports Hosfield's opinion that Superior operated as a company engaged in the business of owning the Coal Lands.

VI.     Additional Findings of Fact

On several occasions during and after the completion of the Superior Dissolution, CNW or its representatives referred to the Superior Dissolution as a merger. CNW reported in its 1956 annual report that its investment in Superior was "Eliminated through merger into Chicago and North Western Railway Company." Ex. 47, Annual Report of Chicago and North Western

Railway Company for the year ending December 31, 1956, at UP-ST192315. The 1956 CNW General Ledger page that reflected Superior's transfers to CNW at dissolution included a statement at the bottom of the page, "To record the merger of the Superior Coal company into the Chicago and North Western Railway Company." 1956 CNW General Ledger, at UP-ST114046.

On February 7, 1957, CNW Assistant General Counsel Edward Warden wrote a memorandum to CNW General Claims Attorney regarding Superior. Warden stated:

> Effective December 31, 1956, the Superior Coal Company was merged with C&NW Ry. Co. Beginning on January 1, 1957, all transactions formerly made by the Superior Coal Company will be handled in the accounts of the C&NW Ry. Co. As a result, responsibility for the handling of transactions related to Superior Coal Company matters is to be transferred to appropriate departments of the Railway Company.

Memorandum Re: Superior Coal Company dated February 7, 1957, at UP-ST094725. Warden stated that CNW would defend the pending mine subsidence claims and pay settlements for such claims. The settlement releases would release both Superior and CNW from all further liability. Id. at UP-ST094726.

The evidence also shows that as of May 1964, CNW still owned the Coal Lands. Ex. 178, Internal CNW Memorandum dated May 6, 1964, from

Auditor of Capital Expenditures W.D. Anderson, to CNW Comptroller N.E.

Kraegel, entitled, "Valuation of Former Superior Coal Company Properties,"

at UP-ST163208 – UP-ST163209.  The evidence does not show if, how, or

when CNW disposed of the Coal Lands.

CONCLUSIONS OF LAW

The Court makes the following conclusions of law.

I.  Superior was a wholly owned subsidiary of CNW

The evidence shows that Superior was a wholly owned subsidiary of

CNW.  CNW contributed all the capital to Superior and held title to 19,995

of the 20,000 shares of stock.  The Court concludes that the five Directors'

Shares were nominally held in the names of the directors of Superior for

the benefit of CNW.  As explained in the Finding of Facts, the parties

intended that Directors would own the Director's Shares only nominally,

that CNW was to be sole beneficial owner of Superior.  The Directors each

held only one share of stock; the Directors never received a dividend; the

Directors never sold the stock; when a Director resigned, he was not paid

for the stock, the stock stayed with the office of Director and went to the

successor Director; the Directors always voted the Directors' Shares the

same way CNW voted its share; and the Directors did not receive any of

the assets of Superior at dissolution. The Directors clearly held the Directors' Shares only for the benefit of CNW.[13]

Under Illinois law at the time, the corporation statute required directors to be shareholders. An individual was qualified to hold the office of director even if he held a single share of stock and had no pecuniary interest in the share of stock. See People ex rel. Matthiessen v. Lihme, 269 Ill. 351, 357-58, 109 N.E. 1051, 1054 (Ill. 1915) ("'It has been held that beneficial ownership is not necessary, and that a person who holds the legal title to stock on the books of the company is qualified [to be a director].'" (quoting Clark & Marshall on Corporations, § 661)); see also Babcock v. Chicago Rys. Co., 325 Ill. 16, 26, 155 N.E.2d 773, 777 (Ill. 1921) (Supreme Court upheld a corporate reorganization and consolidation in which the stockholders of record of the Chicago Railways had no pecuniary interest in the stock.). Thus, a person who held title to one share of stock, with no beneficial interest in that share of stock, "qualified" to be a corporate director under Illinois law. Matthiessen, 109 N.E. at 1054.

CNW and Superior consistently referred to the Directors' Shares as "qualifying shares." E.g., Ex. 89, 1935 History of Superior Coal and CNW,

---

[13] The Court asked the parties to address whether the Director's Shares were subject to a resulting trust. Text Order entered April 9, 2019. Upon review of the parties' submissions and applicable Illinois law, the Court concludes that it is not necessary to consider the equitable doctrine of resulting trust to resolve the issues in this case.

at SDSJ 161; Ex. 136, <u>Consent to Dissolution dated September 30, 1956</u>, at UP-ST094700; Ex. 239, <u>Resolution of CNW Board of Directors dated September 30, 1956</u>, at UP-ST197567. The use of the term "qualifying shares" is consistent with the Illinois Supreme Court's statement in <u>Matthiessen</u> that nominal ownership "qualifies" a person to be a director. In light of the Illinois Supreme Court's holding in <u>Matthiessen</u>, CNW's clear and consistent use of the term "qualifying shares" further supports the conclusion that Superior Directors held these "qualifying shares" only to meet the statutory requirement that a director had to be a stockholder. The Superior Directors did not have a beneficial interest in the Directors' Shares. The Court concludes that the Superior Directors nominally owned the Directors' Shares, and that CNW was the sole beneficial owner of Superior. As such, Superior was a wholly owned subsidiary of CNW.

The Fund argues that <u>Matthiessen</u> and <u>Babcock</u> do not apply to this case because the parties had formal agreements defining the beneficial ownership of the stock. The legal principal set forth in <u>Matthiessen</u>, however, did not require a formal written agreement. Moreover, CNW and Superior repeatedly described the Directors' Shares as "qualifying shares" and treated the Directors as nominal shareholders. These factors support

the conclusion that the Superior directors had no beneficial ownership interest in Superior.

The Fund also argues that the Directors had to have a beneficial ownership interest because the existing Illinois corporation statute in 1903 and the Superior bylaws required the directors to be "bona fide shareholders."  The argument is not persuasive in light of the <u>Matthiessen</u> decision.  The Illinois Supreme Court held that individuals could meet the statutory requirement to be stockholders to qualify to be directors even if the individuals only nominally owned the stock.  <u>Matthiessen</u>, 109 N.E. at 1054.  The Illinois Supreme Court, therefore, did not conclude that the term "bona fide" in the statute precluded nominal stockholders to be directors.  That is exactly what happened here.  CNW was the sole beneficial owner of Superior.  The Directors nominally held the Directors' shares as "qualifying shares" in order to be Directors.  Superior was a wholly owned subsidiary of CNW.

II.     <u>The Superior Dissolution was a Voluntary Dissolution</u>

The Court further concludes that the Superior Dissolution was a voluntary dissolution under then existing Illinois corporation statute and not a statutory merger or other type of termination of a corporation.  The Illinois Corporation Law applicable in 1957 allowed for several methods of

termination of a corporation: merger, voluntary dissolution, sales of assets, involuntary dissolution, and receivership.  Ex. 212, Ill. Rev. Stat. 1949, Ch. 32 ¶¶ 157.61 – 157.94.  Each had its own requirements and procedures. Superior complied with the voluntary dissolution requirements.  Superior's shareholders consented unanimously to the dissolution.  Superior sold its assets; paid its creditors or made provisions to pay its creditors by establishing reserves; and distributed the remaining assets to its shareholder CNW.  Ill. Rev. Stat. 1949, Ch. 32  ¶ 157.76, 157.79.  The Illinois Secretary of State issued a certificate of dissolution in accordance with the voluntary dissolution statute.  Ill. Rev. Stat. 1949, Ch. 32 ¶ 157.81(c).  If a merger had occurred, the Secretary of State would have issued a <u>certificate of merger</u>.  <u>See</u> Ill. Rev. Stat. 1949, Ch. 32, ¶ 157.68.[14] The fact that CNW officials mistakenly referred to Superior's voluntary dissolution as a "merger" in various documents does not change what occurred.  Under Illinois corporation statutes, Superior was voluntarily dissolved.

Pursuant to that dissolution, Superior established reserves for known claims, wound up its business, and distributed its assets to its sole

---

[14] The merger provision of the 1949 law is not included in Ex. 212.  The Court, however, takes judicial notice of the applicable law of Illinois.

beneficial stockholder CNW.  Under Illinois law, creditors holding claims

that accrued prior to the dissolution were authorized to bring actions

against Superior for two years after the dissolution.  Ill. Rev. Stat. 1955, Ch.

32, ¶ 157.94.  That two-year window expired in February 1959.  See

Gillespie, 2015 IL App (4th) 140877 at ¶¶ 95-101.

III.     Under the General Rule of Illinois Corporation Law, CNW was not
Liable for Superior's Debts

Under the general rule of Illinois corporation law, the right to bring

claims against Superior was terminated in February 1959, two years after

the completion of the Superior Dissolution.  Superior's shareholder CNW

had no further obligation to pay claims against Superior, whether from

Superior's distributed assets, or otherwise.  See e.g., Blankenship v.

Demmler, Mfg., Co., 89 Ill.App.3d 569, 571-74, 411 N.E.2d 1153, 1154-57

(Ill. App. 3d Dist. 1980); see also Pielet v. Pielet, 2012 IL 112064 ¶¶ 32-39,

978 N.E.2d 1000, 1008-11 (Ill. 2012).  This general rule reflected the

fundamental policy of Illinois corporation law that a corporation is a distinct

and separate legal entity from its stockholders and stockholders are not

liable for the debts of the corporation.  See e.g., Peetoom v. Swanson, 334

Ill. App. 3d 523, 526-27, 778 N.E.2d 291, 294-95 (Ill. App. 2nd Dist. 2002);

see also Main Bank of Chicago v. Baker, 86 Ill.2d 188, 204-05, 427 N.E.2d

94, 101 (Ill. 1981). The stockholder CNW (or its successor Union Pacific) could not, under general principles of Illinois corporation law, be held liable for the actions of the dissolved corporation, Superior. See <u>Judson Atkinson Candies, Inc., v. Latini-Hohberger Dhimantec</u>, 529 F.3d 371, 378-79 (7th Cir. 2008).

The general principle of limited liability extended to former stockholders of a dissolved corporation. Generally, former stockholders are not liable for claims against a dissolved corporation. Illinois gave creditors a window of two years to pursue claims that accrued before the dissolution, but after that time expired, no claims could be brought against stockholders, such as CNW. See <u>Blankenship</u>, 89 Ill.App.3d at 571-74, 411 N.E.2d at 1154-57.

IV.   <u>The Fund Fails to Prove Exceptions to the General Rule</u>

   A.   <u>The Fund Bears the Burden of Proof</u>

Illinois provides equitable exceptions to the general rule of limited liability. The Fund asserts two of these exceptions: the alter ego exception and the de facto merger exception. See <u>Peetoom</u>, 778 N.E.2d at 294-95 (alter ego exception); <u>Steel Co. v. Morgan Marshall Industries, Inc</u>., 278 Ill. App. 3d 241, 247-48, 662 N.E.2d 595, 599 (Ill. App. 1st Dist. 1996) (de facto

merger exception).  The Fund bears the burden to establish that either exception exists in this case.  See Judson Atkinson, 529 F.3d at 379.

B.     The Alter Ego Exception

Under the alter ego exception, a court may pierce the corporate veil and find stockholders liable for the corporation's debts if: (1) the corporation is the alter ego of the stockholder and (2) "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." Judson Atkinson, 529 F.3d at 379 (quoting Van Dorn Co. v. Future Chem. & Oil Corp., 753 F.2d 565, 569-70 (7th Cir. 1985)).  A corporation is an alter ego of its owner when the stockholder and the corporation are so intertwined that the two are effectively one entity, and the corporation is a mere instrumentality of the stockholder.  See Judson Atkinson, 529 F.3d at 379; Main Bank of Chicago v. Baker, 86 Ill. 2d 188, 204-05, 427 N.E.2d 94, 101 (Ill. 1981). Illinois uses 11 factors to determine whether a corporation and a stockholder have a sufficient unity of interest to consider piercing the corporate veil:

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and

(11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

Judson Atkinson, 529 F.3d at 379 (quoting Fontana v. TLD Builders, Inc., 362 Ill. App. 3d 491, 298, 840 N.E.2d 7 67, 778 (Ill. App. 2$^d$ Dist. 2005)).

The Gillespie Court questioned the significance of such factors in determining whether a corporation was the instrumentality of a corporate shareholder. Gillespie 43 N.E.3d at 1184-89. The Fund urges the Court to follow the Gillespie opinion rather than the Seventh Circuit's decision in Judson Atkinson. The Fund argues that this Court should follow Gillespie because it is more recent than the Seventh Circuit decision in Judson Atkinson. The Fund is incorrect. When deciding questions of state law, federal courts follow the interpretation of the highest court of the state, in this case the Illinois Supreme Court. Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). This Court also must follow the decisions of the Seventh Circuit Court of Appeals. Reiser v. Residential Funding Corp., 380 F.3d 1027, 1029 (7th Cir. 2004). If the Seventh Circuit has determined what Illinois law is on a matter, this Court must follow the Seventh Circuit's interpretation unless a subsequent Illinois Supreme Court decision contradicts the Seventh Circuit's interpretation. It is error to follow a contrary subsequent intermediate appellate court decision, such as the Gillespie decision, to the extent that Gillespie contradicts the Seventh Circuit. Reiser, 380 F.3d at

1029.  The Seventh Circuit's interpretation of Illinois law in <u>Judson Atkinson</u>

is controlling since no subsequent Illinois Supreme Court decision

contradicts the <u>Judson Atkinson</u> decision.

The first seven factors and the last factor weigh against finding a

unity of interest and domination of Superior by CNW.  Superior was

adequately capitalized.  A business is undercapitalized "only when it has so

little money that it could not and did not actually operate its nominal

business as its own."  <u>Judson Atkinson</u>, 529 F.3d at 379 (internal quotation

marks omitted).  Under this standard, Superior was adequately capitalized.

CNW contributed $2,000,000.00 in capital.  Superior had sufficient capital

to operate a coal mining business separate and distinct from CNW's

railroad business.

Superior also maintained the formalities necessary to maintain a

separate corporation.  Superior issued stock, observed corporate

formalities, had functioning officers and directors, held regular meetings of

its board of directors and shareholders, filed annual reports, and kept

books and records separate from CNW's books and records.  CNW

employees kept the records, and CNW employees and officers served as

Superior officers and directors.  Such overlaps are common in parent,

subsidiary relationships and do not merit considering piercing the corporate veil. See Main Bank of Chicago, 427 N.E.2d at 101.

Superior also paid dividends. The parties stipulated that Superior paid dividends out of profits. The evidence showed that some of the dividends were not paid from profits. The $2,150,000.00 dividend in 1930 did not involve any transfer of cash. The arrangement from 1932 to 1934 to "pay" dividends of $.20 a ton that Superior had to transfer in full to pay CNW's obligations on the RFC Loan were hardly true profits. Still, the evidence shows that Superior made money many years of its existence and paid dividends. The parties further stipulated that dividends were paid from profits.

Superior was also solvent. Solvency means a debtor's assets exceed its liabilities. A debtor is presumed to be insolvent when it is not paying its debts as they become due. 1324 W. Pratt Condominium Association v. Platt Construction Group, Inc., 2013 IL App (1st) 130744, ¶ 25, 997 N.E.2d 246, 254-55 (Ill. App. 1st Dist. 2013). The Fund cites no evidence that Superior's assets were less than its liabilities. The Fund also cites no evidence that Superior failed to pay its debts when they became due. The evidence indicates that Superior paid its employees and suppliers in the ordinary course when due. In contrast, CNW was not

solvent in the 1930s and had to file bankruptcy, but Superior had sufficient funds to pay its debts.

The Fund argues that CNW just gave Superior enough money to pay its bills, but Superior did not really have any funds of its own. The evidence is unclear on this point. Pfahler said the price of coal was set to provide Superior with the cash needed to operate. The Fund's expert Akers, however, testified that Superior charged CNW prices for coal that were over cost from 1905 to 1914. In 1933 and 1934, CNW funneled money through Superior to pay the RFC Loan. From 1935 to 1944, a court-appointed bankruptcy trustee was in charge of CNW's operations. The Fund presents no evidence that the trustee gave Superior money to operate. Regardless of these conflicting pieces of evidence, the evidence shows that CNW adequately capitalized Superior, and Superior paid its bills as they became due. Superior was solvent.

Superior also was not a façade for the operation of CNW. A façade is a false front. In the corporate context, a corporation is a façade if it appears to be a separate corporation from the controlling shareholder, but really has no separate existence. See Dismuke v. Rand Cook Auto Sales, Inc., 378 Ill.App.3d 214, 219m 882 N.E.2d 607, 611 (Ill. App. 3[d] Dist. 2007). Superior clearly was not a façade of CNW. CNW operated railroads.

Superior had nothing to do with operating railroads.  Superior owned the Coal Lands, dug coal mines, operated coal mines, maintained equipment to operate coal mines, employed coal miners, negotiated collective bargaining agreements with coal miners' unions, and engaged in other activities to mine and sell coal.  Superior did not falsely represent to the world that it was in the coal business, but really ran trains.  Superior was not a façade for CNW.

The evidence does not show commingling of funds.  Superior and CNW kept separate accounts and funds, but some transactions were performed through adjustments and transfers between CNW and Superior accounts.  Superior's expert Hilton conceded that at least some communications between CNW and Superior took the form of interdepartmental communications of a single company.  <u>See</u> T. 60, at 559-61 (Hilton).  Hilton also agreed that Superior paid some of the 1930 $2,150,000 dividend through adjustments to intercompany accounts. These accounts are used by companies under common control.  This evidence may relate to whether the parties engaged in arms-length transactions but does not show that Superior and CNW comingling funds.  The evidence does not show comingling.

Several of the remaining <u>Judson Atkinson</u> factors show that CNW controlled Superior in many significant ways. The evidence supports the conclusion that Superior and CNW did not engage in arms-length transactions. Most of the coal sales agreements between CNW and Superior did not set the price or quantity of coal to be sold. Only the 1932 and 1934 Agreements set a price. The 1932 Agreement to sell coal at a price of $.20 per ton was not arms-length. Superior had to pay the gross profit of $.20 per ton in full to pay the RFC Loan owed by CNW. That was not an arms-length transaction. The 1934 Agreement required Superior to sell coal at cost. Selling at cost was not typical in arms-length transactions. Apart from the 1932 and 1934 Agreements, Pfahler testified in the Sales Tax litigation that CNW paid a price based on the cash needed to cover Superior's operating expenses. Pricing based on covering the seller's expenses rather than the market price of coal is not an arms-length transaction. During salvage operations in 1953-55, Superior gave CNW the first choice to buy any salvage equipment and supplies. This, again, is not an arms-length transaction.[15]

---

[15] The Fund also cited Superior's decision in 1944 to exchange its pre-bankruptcy CNW securities for post-bankruptcy securities. This bond exchange appears to have been part of CNW's plan of reorganization approved by the court in the bankruptcy rather than an arrangement just between CNW and Superior.

Beyond this, Superior repeatedly engaged in financial transactions with CNW that were not arms-length transactions.  The $2,150,000 dividend in 1930 wiped millions of dollars of debt off CNW's books and turned Superior from a creditor of CNW to a debtor of CNW.  The 1932 Agreement required Superior to use all of its net revenues on coal sales to CNW to pay CNW's RFC Loan.  Superior also bought CNW's bad debt from other creditors in 1933 and 1934.  Superior bought additional 1933 Debentures, additional Freeman Bonds, and additional 1934 Bonds.  None of these transactions were arms-length.  All were designed to help CNW and not Superior.

These financial transactions also diverted Superior's assets to CNW. The diversion of assets is the last Judson Atkinson factor to be considered by this Court.  The diversion of assets is clear.   From 1930 to 1935 CNW repeatedly caused Superior to divert its assets to CNW to try and keep CNW afloat.  The Fund, however, must also show that the diversion of assets was to the detriment of creditors to Superior.  Judson Atkinson, 529 F.3d at 379.  The Fund has presented no evidence that Superior's creditors suffered as a result of the diversion of Superior's assets.  The Fund makes no showing that Superior failed to pay its creditors or employees or defaulted on any other obligation.  The Court concludes that the Fund failed

to meet its burden to prove that Superior's diversion of assets to CNW in the early 1930s was a detriment of Superior's creditors.

The Fund argues that Superior diverted assets to the detriment of the Superior Directors as minority shareholders of Superior. The Fund argues that Superior not only diverted assets to CNW in the 1930s, Superior also paid all dividends to CNW only and none to the Directors as minority shareholders. The Court disagrees. As explained above, the Directors held the Directors' Shares nominally and for the benefit of CNW. Transferring assets to CNW, the sole beneficial shareholder, did not harm the Directors as nominal shareholders at all.

The Fund also argues that Superior withheld dividend payments while CNW was in bankruptcy to the detriment of creditors. The evidence supports the inference that Superior withheld dividends from 1935 to 1944 while CNW was in bankruptcy. Superior regularly declared dividends prior to 1935 but declared no dividends while CNW was in bankruptcy. Superior then made two of its largest dividend payments in 1946 and 1949, a few years after CNW came out of bankruptcy. This evidence supports the inference that Superior withheld payment of dividends while CNW was in bankruptcy. See T. 58, 172 (Hosfield).

Superior's apparent withholding of dividends, however, might have tended to harm CNW's creditors, but did not harm Superior's creditors. The relevant Judson Atkinson factor required a showing that the diversion of assets was to the detriment of the creditors of the debtor corporation. Superior is the debtor corporation in this analysis. The Fund asks the Court to pierce Superior's corporate veil to impose liability on its stockholder CNW (and thereby CNW's successor Union Pacific). Superior's apparent withholding of dividends did not harm its creditors. If anything, retaining assets which could have been used to pay dividends by Superior would have benefitted Superior's creditors. This last factor still weighs in favor of not piercing the corporate veil.

Apart from the factors in Judson Atkinson, the Fund argues that Superior admitted in the Tax Case it was completely dominated by CNW and was a mere department of CNW, not an independent corporation. Superior's statements on which the Fund relies were argument and legal conclusions that Superior pressed in the Tax Case. The Fund asks the Court to bind Superior's legal position in the Tax Case on to Union Pacific. A party's legal position in a prior case is binding on that party in a subsequent case only if the party succeeded in the first case. See e.g., New Hampshire v. Maine, 532 U.S. 742, 749 (2001); Eagle Foundation,

Inc. v. Dole, 813 F.2d 798, 810 (7th Cir. 1987). Superior failed in the Tax Case. The Illinois Supreme Court rejected Superior's position that the Court should pierce its corporate veil and find it to be a mere department of CNW. Superior Coal I, 36 N.E.2d at 360. Superior, therefore, was not bound in subsequent cases by the position it took in the Tax Case. Because Superior was not bound, Union Pacific certainly is not bound.

This Court considered the factual evidence from the Tax Case presented here. That evidence supported the conclusion that Superior and CNW did not engage in arms-length transactions as discussed above. That factor weighs in favor of finding that CNW dominated and controlled Superior for its purposes.

Overall, however, the factors listed in Judson Atkinson do not demonstrate that the Court should recognize an exception to the general rule that stockholders are not liable for the debts of the corporation. Too many factors discussed above indicate that Superior operated as a separate corporation. The Fund has a heavy burden to prevail on this claim. Under Illinois law, "Piercing the corporate veil is not favored and in general, courts are reluctant to do so." Judson Atkinson, 529 F.3d at 379. In this case, too many factors indicate a lack of unity of interest necessary to pierce the corporate veil.

Moreover, the Fund failed to prove the second element of the alter ego exception necessary to pierce the corporate veil. The Fund failed to demonstrate that maintaining the legal distinction between corporation and stockholder would sanction a fraud or promote injustice. See Main Bank of Chicago, 427 N.E.2d at 101. The Fund failed to show any injustice other than its inability to recover from an entity that ceased to exist more than 45 years before the Subsidence claims at issue in this case arose. The injustice, however, cannot be merely that the creditor will not get paid if the general Illinois corporate law applied. The party seeking to pierce the corporate veil must show more:

> [T]he courts that properly have pierced corporate veils to avoid "promoting injustice" have found that, unless it did so, some "wrong" beyond a creditor's inability to collect would result: the common sense rules of adverse possession would be undermined; former partners would be permitted to skirt the legal rules concerning monetary obligations; a party would be unjustly enriched; a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities; or an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful.

Sea-Land Services, Inc. v. Pepper Source, 941 F.2d 519, 524 (7th Cir. 1992).

The Fund has failed to demonstrate such wrongs in the ownership and operation of Superior. The Fund presents no evidence that CNW used

Superior to deceive or defraud anyone. CNW disclosed in all its filings that Superior was a wholly owned subsidiary. CNW annually stated on the public record in its ICC reports that Superior was a wholly owned subsidiary. CNW further ensured that Superior had sufficient funds to pay its bills. Even when CNW and Superior engaged in transactions in the late 1920s and early 1930s that were designed to aid CNW's bottom line, Superior was always able to pay its expenses and stay in operation. The Fund presents no evidence that CNW ever defrauded any creditor of Superior. The Fund presents no evidence that any creditor or employee of Superior ever lost anything at the time of these transactions.

The Fund again notes that Superior did not pay dividends to CNW during CNW's bankruptcy. This decision may have been adverse to CNW's creditors. The Fund, however, must demonstrate that CNW engaged in deceptive, fraudulent, or unfair activity that was adverse to the creditors or other interested parties of Superior. Withholding dividends to CNW during its bankruptcy benefited Superior's creditors, employees, and other interested parties; withholding dividends did not harm them. Furthermore, CNW was controlled by a court-appointed bankruptcy trustee while it was in bankruptcy. The Fund has not shown that the court-appointed trustee engaged in any deceptive, fraudulent, or unfair conduct

by deciding not to vote in new Superior Directors who would pay dividends to CNW in bankruptcy. The decision by Superior to withhold payment of dividends while CNW was in bankruptcy does not show unfair, deceptive, or fraudulent conduct that warrants imposing liability on Superior's stockholder CNW, and its successor, Union Pacific.

The Fund again argues that CNW's domination of Superior harmed the Superior Directors as minority shareholders. The Court has already rejected this argument. The Directors held the five Directors' Shares nominally for the benefit of CNW. The Directors, therefore, had no beneficial interest in Superior and were not injured by CNW's control of Superior. Furthermore, the Superior Directors had a fiduciary duty to operate Superior for the benefit of its sole beneficial shareholder, CNW. The Fund has failed to demonstrate any harm to Superior's Directors as nominal shareholders.

The Fund argues CNW and Superior acted deceptively and fraudulently to the detriment of future contingent mine subsidence claim holders such as the Bartolinos and the Bessermans. The Fund argues that Pfahler told CNW that additional subsidence claims were likely to arise in the future and Superior and CNW made no provision for those claims when Superior was dissolved. Rather, the Fund argues, Superior turned over its

assets, including the Coal Lands worth in excess of $1,000,000.00, to CNW free and clear of these future claims. According to the Fund, CNW and Superior thereby knowingly manipulated the Superior Dissolution to deprive future mine subsidence claimholders compensation from those assets.

The Court rejects this argument for several reasons. CNW and Superior followed the Illinois corporation law to effectuate the Superior Dissolution, and the Illinois corporation law did not require maintaining reserves for indefinite possible contingent future claims. The Illinois law required dissolving companies to pay or provide for the payment of known claims. Ex. 212, Ill. Rev. Stat. 1949, Ch. 32, §157.79. The Illinois corporations law further required all other creditors to bring claims against Superior within two years of the dissolution. Ex. 212, Ill. Rev. Stat. 1955, Ch. 32, ¶ 157.94. The Illinois corporation law, thus, contemplated that there would be a finality of any liability for corporate claims at that point. This is consistent with the policy of Illinois corporate law that stockholders are not personally liable for the debts of the corporation. Superior and CNW followed the law. They did not manipulate anything. The Fund's complaint is with Illinois corporation law, not the decisions of Superior and CNW to abide by that law.

The evidence also shows that CNW had very good reasons to dissolve Superior.  These reasons were unrelated to any supposed effort to avoid future contingent, unknown claims.  CNW set up Superior to provide coal for its locomotives.  CNW switched to diesel locomotives in the late 1940s and did not need the coal.  CNW's reason for owning Superior ceased to exist.  Superior started to sell coal to third parties in 1947, but those sales alone were not sufficient to make Superior viable.  CNW tried to sell Superior but found no takers.  CNW then decided to cut its losses and dissolve Superior.  CNW could not find a buyer for Superior as a going concern. Hence, Superior sold its equipment and supplies.  Superior tried to sell the Coal Lands, but those efforts were unsuccessful.  After making reasonable efforts to sell everything that could be sold at a reasonable salvage price, CNW dissolved Superior.

The Court, further, finds no evidence that CNW went through all this to secret away the Coal Lands to itself and away from unknown contingent mine subsidence claimholders that might appear in the future.  The Coal Lands also were worth not in excess of $1,000,000.00.  Pfahler estimated $1,000,000.00 value if Superior was sold as a going concern.  Morehouse stated that the salvage value of the Coal Lands would be far less.  The evidence shows that the Coal Lands had little or no salvage value.  No one

wanted to buy Superior as a going concern; no one even wanted to buy the Coal Lands at salvage value. The Coal Lands contained high sulfur coal that was less valuable and less marketable than readily available low sulfur coal. CNW was not secreting away a gold mine; it was taking possession of Coal Lands that no one wanted.

Finally, Pfahler did not predict massive numbers of subsidence claims that would arise more than 50 years in the future. Pfahler said that a few more subsidence claims might arise in the areas adjacent to the current claims. The possibility of a few, additional future claims was not a factor in the decision to dissolve Superior. CNW officials made a business decision to dissolve Superior because CNW no longer needed Superior and could not sell Superior. The Fund fails to show any intent to deceive or defraud anyone. CNW and Superior followed the law and provided for known claims. The possible additional claimants had two years to file claims after the dissolution. Illinois, not CNW, decided in its corporation law that two years was sufficient for such creditors. Following the law on corporate dissolutions was not unfair, deceptive or fraudulent.

The Fund fails to show that CNW operated or used Superior to engage in any unfair, deceptive, or fraudulent conduct adverse to Superior's creditors or other interested parties. The Fund, therefore, fails to

show that the alter ego exception should apply in this case to the general rule of no liability for Superior's stockholder CNW, and CNW's successor in interest Union Pacific.[16]

## C. De Facto Merger

The Fund also fails to demonstrate that the Superior Dissolution was a de facto merger. The de facto merger exception applies to certain transactions in which corporate owners transfer an ongoing business operation from a debtor corporation to a new corporation that they own, and then dissolve the debtor corporation. The same owners keep the same ongoing business in the new corporation but leave no assets in the dissolved corporation to pay the dissolved corporation's creditors. If the elements of the de facto merger exceptions are proven, the court will find the new corporation is still responsible for the debts of the dissolving corporation.

To establish that the de facto merger exception applies, the Fund must show:

(1) there is a continuity of the business enterprise between seller and buyer, including continuity of management,

---

[16] The Fund argues in its supplemental brief regarding the resulting trust doctrine that a parent corporation may be able to breach its fiduciary duty to its subsidiary. Plaintiff's Supplemental Brief (d/e 67), at 7, citing In re Rehabilitation of Centaur Ins. Co., 158 Ill.2d 166, 174, 632 N.E.2d 1015, 1018 (Ill. 1994). A subsidiary, however, may not pierce the corporate veil of its parent corporation under an alter ego theory. Id. at 173-74. Furthermore, creditors such as the Fund may not raise such a breach of fiduciary duty claim. Id. The Fund, therefore, may not rely on any alleged possible breach of a fiduciary duty owed by CNW to Superior to establish its alter ego claim.

employees, location, general business operations and assets;
(2) there is a continuity of shareholders, in that shareholders of
the seller become shareholders of the buyer so that they
become a constituent part of the buyer corporation; (3) the
seller ceases operations and dissolves as soon as possible
after the transaction; and (4) the buyer assumes those liabilities
and obligations necessary for the uninterrupted continuation of
the seller's business.

Steel Co., 662 N.E.2d at 599-600.

The Fund fails to show that CNW continued the business enterprise of Superior. Superior operated coal mines. Those mines shut down. At the time of the Superior Dissolution, Superior had no ongoing business operations. Superior sold all the equipment and supplies necessary to operate coal mines. Superior tried to sell all of its assets. Superior sold all of its CNW securities. Superior tried to sell the Coal Lands but was not successful. The Court has already rejected Hosfield's opinion that Superior engaged in the business of holding the Coal Lands. That opinion is contrary to the facts for the reasons discussed in the Findings of Facts above (see p. 47-48 above). Superior's Board of Directors stated in 1955 that Superior was not an operating company more than a year before the Superior Dissolution. Ex. 2, Superior Minute Book Vol. 2, at UP-ST191973. Because Superior was not an operating company, CNW did not continue its business enterprise after the Superior Dissolution. The Fund failed to establish this element of the de facto merger.

CNW also did not assume the liabilities necessary to keep Superior operating.  The Fund presents no evidence that CNW took on Superior's obligations to pay its employees to keep operating the mines or took on any obligations of Superior to keep the mines operating.  CNW did not assume the obligations to continue Superior's business enterprise because Superior was not operating at the time of the Superior Dissolution.  Superior provided reserves for its ongoing pension liabilities, and its ongoing known tort liabilities, including mine subsidence.  Superior transferred those reserves to CNW to pay those remaining debts, not to keep the mines operating.  The Fund fails to prove this element of its de facto merger theory.

The Fund also fails to show that the stockholders of Superior became the stockholders of CNW.  A major factor in a de facto merger claim is proof that the acquiring corporation paid stock for the assets of the dissolving corporation's assets.  Travis v. Harris Corp., 565 F.2d 443, 447 (7th Cir. 1977); Myers v. Putzmeister Inc., 232 Ill.App.3d 419, 423, 596 N.E.2d 754, 756 (Ill. App. 1st Dist. 1992); Manh Hung Nguyen v. Johnson Mach. & Press Corp., 104 Ill.App.3d 1141, 1148-49, 433 N.E.2d 1104, 1110 (Ill. App. 1st Dist. 1982).   CNW did not pay stock for Superior assets.

Rather, Superior merely distributed its assets to its shareholder as part of the Superior Dissolution.

The Fund characterizes this argument as "hyper-technical" and urges the Court to not require proof of this technicality to avoid unjust results. Plaintiff's Response to Defendant's Post-Trial Brief (d/e 65), at 23. Requiring proof of the payment of stock for assets is not a hyper-technical requirement. Payment of stock for assets is an important factor that can, under proper circumstances, make a corporate dissolution effectively a merger. The acquiring corporation pays stock to the dissolving corporation which then distributes the stock to its shareholders on dissolution. This sequence of events is substantially similar to a stock-for-stock merger transaction for the equity holders; the merged corporation's business enterprise becomes part of the surviving corporation and the stockholders of the merged corporation become stockholders of the surviving corporation. This type of stock-for-assets manipulation, however, may not be the same as a merger for the creditors. The surviving corporation is liable for the merged corporation's debts after the merger. The creditors of a dissolving corporation can only look to the dissolving corporation's assets to pay their claims. If the dissolving corporation sold its assets for stock that is distributed to its stockholders, however, there may be no assets left

to pay the dissolving corporation's creditors. The de facto merger doctrine prevents this type of unequitable result for the dissolving corporation's creditors. <u>See</u>, 565 F.2d at 447.

In this case, Superior did not sell its ongoing business enterprise to CNW for stock. Rather, Superior's business enterprise ceased, and Superior dissolved and distributed its assets to its stockholder, CNW. The dissolution did not leave its creditors high and dry with no available assets to satisfy their claims. Rather, Superior either paid all its known creditors or established reserves used to pay known creditors as those debts came due, in accordance with Illinois law. The de facto merger doctrine simply does not apply to this circumstance.

The Fund has failed to prove a basis to overcome the general rule that stockholders are not liable for the debts of the corporation. The Fund has failed to prove that CNW engaged in any conduct that merits piercing the corporate veil under the alter ego exception. The Fund has failed to prove that a de facto merger occurred. Union Pacific, therefore, is entitled to judgment.

D. <u>Expert Opinions</u>

The parties' experts provided opinions that the Court has not specifically discussed and that may contradict this Court's findings and

conclusions. The Court has carefully considered the experts' opinions. To the extent the opinions are inconsistent with this Court's findings and conclusions, the Court gives those opinions no probative weight.

The parties' experts provided invaluable assistance in identifying relevant information in the masses of 50 years of corporate records. Some of the experts provided valuable historical information about coal markets and valuable analyses of accounting and financial records. Many of the experts' opinions, however, were irrelevant to the central issues, particularly the issues of whether CNW used Superior to engage in deceptive, fraudulent or unfair acts, and whether the Superior Dissolution was a de facto merger. Many of the experts' opinions were little more than dressed-up legal conclusions. The Court is more than capable of reading the relevant documents and determining the facts and conclusions of law from these documents on its own. The experts' efforts at espousing legal opinions was not helpful and carried no weight with the Court.

E.   Final Policy Considerations

Finally, the Fund argues that a finding of no liability by Union Pacific will devastate thousands of people whose homes will be destroyed as Superior's mines continue to subside. The Court respectfully disagrees. Illinois created the Fund to be the reinsurer of last resort. The Bessermans

and the Bartolinos received full compensation for their losses up to the limits of insurance they purchased.  The Fund will continue to provide reinsurance for other subsidence claims in the same way.  Homeowners will not be devastated.

Still, the Fund is charged with recovering the costs of reinsurance from responsible parties. Imposing financial responsibility on Union Pacific in order to recover costs from responsible parties, however, conflicts with the Illinois legal principle that stockholders of a corporation are separate and distinct from the corporation and are not liable for the corporation's debts that is firmly established in Illinois law.  See e.g., In re Rehabilitation of Centaur Ins. Co., 158 Ill.2d 166, 172, 632 N.E.2d 1015, 1017 (Ill. 1994); Main Bank of Chicago, 427 N.E.2d at 101; Dregne v. Five Cent Cab Co., 381 Ill. 594, 602-03, 46 N.E.2d 386, 389 (Ill. 1943); Apollo Real Estate Investment Fund, IV, L.P. v. Gelber, 398 Ill.App.3d 773, 935 N.E.2d 949, 961-62 (Ill. App. 5th Dist. 2009); Fontana v. TLD, Builders, Inc., 362 Ill.App.3d 491, 500, 840 N.E.2d 767, 775-76 (Ill. App. 2d Dist. 2005);  This legal principle is fundamental to the organization and structure of many businesses.  Individuals and business entities rely on this principle when structuring businesses and making investments.  See e.g., Peetoom v.

Swanson, 334 Ill.App.3d 523, 526-27, 778 N.E.2d 291, 294 (Ill. App. 2nd Dist. 2002).

The Fund asks the Court to disregard this established principle of Illinois law because the Fund faces large, even immense, potential liability for damages from future subsidence of Superior's mines. The magnitude of the Fund's potential liability as reinsurer of last resort does not justify violating established Illinois law. The Court realizes that the cost to satisfy the Fund's future liabilities will be shifted somewhere, either in the form of increased taxes; increased insurance premiums; delays or defaults in payment of claims; or elsewhere. The Fund should present these concerns to the Illinois General Assembly, not this Court. This Court cannot, and will not, ignore a basic principle of Illinois law that corporate stockholders are not liable for the debts of the corporation.

The stockholder, CNW, was not liable for the debts of Superior that were contingent, unknown debts at the time of the Superior Dissolution in 1957. CNW, and its successor Union Pacific, therefore, are not liable for the Subsidence Claims that arose more than 45 years later in 2014 and 2015. Union Pacific is entitled to judgment in this case.

THEREFORE, IT IS ORDERED that this Court enters judgment in favor of Defendant Union Pacific Corporation and against Plaintiff Illinois

Mine Subsidence Fund on all claims in this case. Defendant Union Pacific's Motion at the Close of Plaintiff's Case for Judgment on Partial Findings (d/e 52), Motion at Trial to Strike Akers Opinion Testimony (d/e 53), and Motion at Trial to Strike Hosfield Opinion Testimony (d/e 54) are DENIED as moot. All other pending motions are denied as moot.

THIS CASE IS CLOSED.

ENTER: August 26, 2019


_____s/ _Tom Schanzle-Haskins_____

TOM SCHANZLE-HASKINS

UNITED STATES MAGISTRATE JUDGE